Filed  5/15/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| BOATWORKS, LLC,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>CITY OF ALAMEDA et al.,<br><br>        Defendants and Appellants. | A151063, A151919<br><br>(Alameda County<br>Super. Ct. No. RG14746654) |

The Mitigation Fee Act (Gov. Code, § 66000 et seq.)[1] authorizes local agencies to impose fees on a development project in order to defray the cost of public facilities needed to serve the growth caused by the project, as long as the fees are reasonably related to the burden caused by the development.  (§§ 66000, subd. (b), 66001; see *Ehrlich v. City of Culver City* (1996) 12 Cal.4th 854, 864-865 (*Ehrlich*); *Shapell Industries, Inc. v. Governing Board* (1991) 1 Cal.App.4th 218, 234-235 (*Shapell*).)

In 2014, the City of Alameda adopted an ordinance establishing fees it would impose as a condition for approving future development.  Boatworks brought this facial challenge to the ordinance, alleging that the proposed fees for park facilities lack a reasonable relationship to the burden of future development and hence violate the Mitigation Fee Act.[2]  The trial court concluded the fees are excessive and constitute invalid exactions in three respects:  by imposing on new residents the purported cost of

---

[1] All undesignated statutory references are to the Government Code.

[2] The named defendants in this action are the City of Alameda and the City Council for the City of Alameda.  We shall refer to them collectively as the City.

1

acquiring land for parks, although the City does not need to buy new parkland; by including in its inventory of current parks two parks that were not yet open; and by categorizing certain areas as parks rather than (less expensive) open space. The court rejected the remainder of Boatworks's specific challenges. It ordered the City to excise and vacate the portions of the ordinance authorizing development impact fees for parks and recreation.

Both the City and Boatworks have appealed from the judgment. The City has also appealed a post-judgment order awarding attorney fees. We have consolidated the two appeals for purposes of decision. We conclude the trial court erred only in two respects: in ruling the City could not treat certain areas as parks, and in the form of the remedy it imposed.

## I.  BACKGROUND

The City of Alameda includes land at Alameda Point formerly owned by the United States Navy. After the Alameda Naval Air Station closed in 1997, the Navy transferred the majority of the property to the City at no cost for civilian use. The City plans to develop Alameda Point with residential units, commercial space, parks, and open space. Other areas of the City also have the potential for new development.

In 2014, the City updated its development fee ordinance, which had not changed since 2001. In preparation, it commissioned from Willdan Financial Service the "Development Impact Fee Update and Nexus Study" (the nexus study, or the study). The purpose of the study was to analyze the development impact fees needed to support development in the City through 2040, and the study became the basis for the fees the City later authorized.

To calculate new developments' fair share of park facilities, the nexus study used the "existing inventory approach," which it explained "allocates costs based on the ratio of existing facilities to demand from existing development," with the goal that facilities will expand at the same rate as the population expands, preserving the current standard for park facilities. This was a multi-step process.

The study first made an inventory of the City's park and recreational facilities, which encompassed approximately 157 acres of parkland and 24 acres of open space. It estimated the cost per acre for developing parkland and open space, setting the cost of acquiring land for park facilities at $1,437,000 per acre and the cost of parkland improvements and facilities at $529,800 per acre, for a total cost of almost $2 million per acre for active-recreation parkland. Because open space is less intensively developed than active-recreation parkland, the study assigned to open space acres only the cost of acquiring the land, and treated each acre of open space as the equivalent of approximately three-quarters of an acre of parkland.[3] Based on these calculations, an inventory of existing parkland and open space, and the City's population in 2013, the study concluded the existing standard was 2.4 acres of parkland per 1,000 residents.

The nexus study then calculated the cost of additional facilities that would be needed to maintain this standard. With the addition of 8,260 residents by 2040,[4] an additional 19.82 acres of improved parkland would be needed to maintain the existing ratio of parkland to residents. At $2 million per acre, the study calculated a total cost of $39 million for park facilities to accommodate new development, a number that represents $28.5 million to acquire land for parks, plus $10.5 million to improve it. Based on its assumption of the number of residents who would live in each new unit, the study proposed a total park and recreation facilities fee per dwelling unit of $12,809 for single family homes and $9,149 for multifamily homes.

---

[3] To be precise, the cost of acquiring land was 73 percent of the total calculated cost of $1,966,800 per acre for park facilities. Thus, the City's 24.15 acres of open space were treated as 17.63 acres (i.e., 73 percent of 24.15) for purposes of calculating the City's total park facilities. The City's total acres of improved parkland were then calculated as 175.14 (the sum of 157.51 acres of actual improved parkland and 17.63 equivalent improved acres).

[4] This figure excluded development at Alameda Point, which was considered in a separate section of the nexus study. Boatworks does not raise any challenges to impact fees related to development at Alameda Point.

The nexus study stated that the City planned to use the park facilities fee revenue to "purchase parkland or construct improvements to add to the system of park and recreation facilities that serves new development." It included a preliminary list of planned park facilities, including the Alameda Point sports complex, Jean Sweeney Open Space Park construction, and Estuary Park athletic fields and park construction. The total project costs of those planned facilities was estimated to be $26.5 million, which would be fully funded by the park facilities fee. Additional facilities would also need to be identified to maintain the City's existing parkland standard.

The City adopted Ordinance No. 3098, the Development Impact Fee Ordinance, on July 16, 2014 (the ordinance). The only component of the ordinance at issue here is parks and recreation. Citing the nexus study, the ordinance included a finding that there was a reasonable relationship between the need for new and improved park and recreation facilities and the type of development on which the fee would be imposed, since new residents would use parks and recreational facilities throughout the City, and that current service levels would fall if additional facilities were not provided. The ordinance set impact fees, of which $11,528 for single family homes or $9,149 for multi-family units was attributable to parks and recreation fees. The amount for single family homes is somewhat below the amount proposed in the nexus study, while the amount for multi-family units is exactly what the study proposed.

Boatworks brought a petition for writ of mandate and complaint for declaratory and injunctive relief, alleging the nexus study inflated the amount of parkland fees necessary to maintain the current level of service. The trial court agreed, finding the City violated the Mitigation Fee Act in three respects: it authorized fees to pay for the value of land the City already owned; its inventory of current parks—which established the current standard for parkland—included parks that were not yet open; and the inventory miscategorized three open space areas as parks. The court issued a writ of mandate directing the City to excise and vacate the portions of the ordinance that authorized development impact fees for parks and recreation.

## II. DISCUSSION

### A. Legal Landscape

The Mitigation Fee Act "was passed by the Legislature 'in response to concerns among developers that local agencies were imposing development fees for purposes unrelated to development projects.' " (*Ehrlich*, *supra*, 12 Cal.4th at p. 864.) It "embodies a statutory standard against which monetary exactions by local governments subject to its provisions are measured." (*Id*. at p. 865.) Section 66001 requires the agency to "[i]dentify the purpose of the fee," "[i]dentify the use to which the fee is to be put," "[d]etermine how there is a *reasonable relationship* between the fee's use and the type of development project on which the fee is imposed," and "[d]etermine how there is a *reasonable relationship* between the need for the public facility and the type of development project on which the fee is imposed." (§ 66001, subd. (a), italics added.)

"While it is 'only fair' that the public at large should not be obliged to pay for the increased burden on public facilities caused by new development, the converse is equally reasonable:  the developer must not be required to shoulder the entire burden of financing public facilities for all future users.  '[T]o impose the burden on one property owner to an extent beyond his [or her] own use shifts the government's burden unfairly to a private party . . . .' [Citation.]  It follows that facilities fees are justified only to the extent that they are limited to the cost of increased services made necessary by virtue of the development. [Citations.]  The [public agency] imposing the fee must therefore show that a valid method was used for arriving at the fee in question, 'one which established a reasonable relationship between the fee charged and the burden posed by the development.' " (*Shapell*, *supra*, 1 Cal.App.4th at pp. 234–235.)  However, the figures upon which the public agency relies will necessarily involve predictions regarding population trends and future building costs, and they need not be exact. (*Id*. at p. 235.) "As a practical matter it will not always be possible to fashion a precise accounting allocating the costs, and consequent benefits, of particular building projects to particular portions of the population.  All that is required of the [agency] is that it demonstrate that

development contributes to the need for the facilities, and that its choices as to what will adequately accommodate the [new population] are reasonably based." (*Id.* at p. 239.)

The adoption of development impact fees under the Mitigation Fee Act is a quasi-legislative act, which we review under the standards of traditional mandate. (*Garrick Development Co. v. Hayward Unified School Dist.* (1992) 3 Cal.App.4th 320, 328; Code Civ. Proc., § 1085.) "We determine only whether the action taken was arbitrary, capricious or entirely lacking in evidentiary support, or whether it failed to conform to procedures required by law." (*Garrick Development Co.*, at p. 328; *Warmington Old Town Associates v. Tustin Unified School Dist.* (2002) 101 Cal.App.4th 840, 861–862.) "The action will be upheld if the City adequately considered all relevant factors and demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling statute." (*Home Builders Assn. of Tulare/Kings Counties, Inc. v. City of Lemoore* (2010) 185 Cal.App.4th 554, 561 (*City of Lemoore*).)

In a challenge to development fees, the public agency bears the initial burden of producing evidence to show it used a valid method for imposing the fee in question. If it meets this burden, the plaintiff must establish that the fee is invalid, that is, that its use or the need for the public facility are not reasonably related to the development, or "the amount of the fee bears no reasonable relationship to the cost of the public facility attributable to the development." (*City of Lemoore*, *supra*, 185 Cal.App.4th at p. 562.)

On appeal, we review the agency's decision independently and apply the same standard of review as does the trial court. (*Walker v. City of San Clemente* (2015) 239 Cal.App.4th 1350, 1362.)

## B. The City's Appeal

### 1. Cost of Purchasing Land

The City makes three substantive challenges to the trial court's ruling. First, it contends the trial court erred in concluding the park and recreation fee was based on the need to purchase 19.82 acres of new parkland.

As the City points out, the use of a methodology similar to the nexus study's "existing inventory" approach was approved in *City of Lemoore*. The city there relied on

6

a report that proposed a community/recreation facility impact fee to fund the cost of adding facilities that would maintain the current level of service as the city grew. It calculated those fees "based on the existing ratio of community and recreation facility asset value to population, the rationale being that the need for such facilities is based on the size of the population to be served." (*City of Lemoore*, *supra*, 185 Cal.App.4th at p. 563.) The report took the amount the city had invested in existing recreational facilities and divided that number by the current population to calculate a per capita cost, then multiplied that cost by the population per unit of development type to calculate the fee per unit. (*Ibid.*) The appellate court concluded that this "standard-based method" of calculating fees was reasonable: "There is no question that increased population due to new development will place additional burdens on the citywide community and recreation facilities. Thus, to maintain a similar level of service to the population, new facilities will be required. It is logical to not duplicate the existing facilities, but rather, to expand the recreational opportunities. . . . *Since the [new] facilities are intended for citywide use, it is reasonable to base the fee on the existing ratio of community and recreation facility asset value to population.*" (*Id.* at p. 565, italics added.)

The City argues the nexus study's analysis is proper because it took essentially the same approach as the study in *City of Lemoore*. The italicized language in the preceding paragraph, taken in isolation, might support the City's position. But the difference between this case and *City of Lemoore* is that here, it is undisputed that the City already possesses most of the land needed for new park and recreation facilities, and that some of these facilities will be on land the City acquired from the Navy at no cost. Indeed, at the trial below, counsel for the City conceded that, with the exception of a small amount of land for Jean Sweeney Park, the City did not need to, and did not plan to, use the fees to purchase new parkland; rather, it planned to use the fees to improve existing assets. Yet almost three quarters of the impact fee for parks and recreation was justified by the supposed costs of acquiring new land for parks ($28.5 million of the $39 million, per the nexus study). The City is simply not in the same position as the City of Lemoore, where

7

the community recreation fee calculation began with the amount the city had *invested* in existing recreational facilities.

The City argues that the trial court's decision was erroneously based on a "literal reading of [a] single inartful statement," that is, the statement in the nexus study that to accommodate new development at the current standard, "new development must fund the *purchase and improvement* of 19.82 parkland acres, at a total cost of approximately $40 million." (Italics added.) The City acknowledges that it already owns most of the land it intends to develop into new park and recreation facilities, but points to language in the same chapter in the nexus study stating that it will use the park facilities fee revenue "to purchase parkland *or construct improvements* to add to the system of park and recreation facilities that serves new development."

The issue before us, however, is not whether the wording in the nexus study is ambiguous, but whether the City has shown a reasonable relationship between the fee's use and the burden posed by new development. (§ 16001, subd. (a); *Shapell*, *supra*, 1 Cal.App.4th at p. 235.) We conclude that it has not.

We are guided by a different portion of *City of Lemoore*. One of the fees challenged there was a fire protection impact fee for the east side of the city. (*City of Lemoore*, *supra*, 185 Cal.App.4th at p. 571.) The facilities and equipment needed to serve future development were already in place, so the fees for that area were intended to recover new development's proportionate share of their cost. (*Id*. at pp. 571–572.) The appellate court concluded these fees were invalid. It reasoned, "While a fee may be imposed to cover costs attributable to increased demand for public facilities reasonably related to the development project in order to (1) refurbish existing facilities to maintain the existing level of service or (2) achieve an adopted level of service that is consistent with the general plan [citation], the existing east side fire protection facilities are already adequate to continue to provide the same level of service. *In other words, the new development will not burden the current facilities*." (*Id*. a p. 572, italics added.) In a similar manner, the City here already owns the land it needs to develop most or all of the proposed parks and recreational facilities. A calculation that is based on the cost of

8

buying new land—untethered from whether the City actually plans to do so—is not reasonably related to the burden posed by anticipated new development.

The City's position is that regardless of whether it needs to purchase new land to fund new park facilities, it is entitled to take into account the value of the land under its current park facilities in setting development impact fees. It argues, "It does not matter whether the City uses fee proceeds to purchase new parkland, to improve existing parkland, or to construct new recreational facilities. All that matters is that the City is collecting a park and recreation fee *calculated to match the City's existing level of investment in such facilities*." (Italics added.) That characterization goes too far. The Development Fee Act allows the City to impose fees that have a reasonable relationship to the *burden* posed by the development. (*Shapell*, *supra*, 1 Cal.App.4th at p. 235.) But a fee based in significant part on costs the City will not incur, because it has already acquired ample land at no cost, does not have a "reasonable relationship to the cost of the public facility attributable to the development." (*City of Lemoore*, *supra*, 185 Cal.App.4th at p. 562.) The trial court correctly so ruled.

*2. Inclusion of Current Parks in Inventory*

The City also argues the trial court erred in finding it improperly included in its inventory of current parks two that were not currently open to the public. The nexus report included Estuary Park in its inventory of existing parkland and Jean Sweeney Open Space Park in its inventory of existing open space. These facilities were part of the total acreage of parkland and open space that formed the basis for the existing parkland standard, which was used to justify the parkland development impact fees. Without these parks, the City's calculated investment in park facilities would have been lower, and in turn the impact fees would have been lower as well.

The problem is that neither of these parks was open to the public when the City adopted the ordinance. The City acknowledges that fact, but argues it was reasonable to include them in its inventory of existing assets because it anticipated using them as parks in the near future. However, the nexus study proposed using the development impact fees for *construction* of Jean Sweeney Open Space Park and of Estuary Park and its

9

athletic fields. Nothing the City says persuades us it is proper to use a park as part of existing inventory for purposes of setting fees, then use those very fees to develop that park.[5]

We need not, and do not, decide whether or to what extent it would be permissible for an inventory of existing parks to include planned parks whose improvement will *not* be funded by development impact fees. We merely hold that this record does not show it was reasonable to include Jean Sweeney Open Space Park and Estuary Park in the City's inventory of existing parkland.

### 3. *Open Space or Parks*

In its inventory of existing parks, the nexus study included Shoreline Park, Bill Osborne Model Airplane Field, and two boat ramps. However, in previous documents prepared by the City, notably the Parks and Recreation element of its General Plan, these areas are included within "Community Open Space," rather than "Neighborhood Parks" or "Community Parks." The City's 1999 application to the National Park Service for a public benefit conveyance of surplus federal real property also classified these properties as community open space. The trial court ruled that the City violated the Mitigation Fee Act in treating these areas as parks rather than open space, because there was no evidence the City had a factual basis to classify these areas differently than it had when adopting the General Plan. We conclude this ruling was erroneous.

The nexus study explained, "Open space is less intensively developed than active recreation parkland. As such, this analysis weights the value of open space less than that of active parkland when calculating park level of service facility standards." Specifically, the study treated an acre of open space as worth 73 percent of an acre of parkland. Thus, the cost of providing facilities at the current standard was greater if the areas in question were treated as parks than if they were treated as open space.

---

[5] The City now concedes that Estuary Park was not an improved park at the time of the nexus study, and takes the position that it should have been treated as open space rather than parkland, but this concession does not go far enough because Estuary Park was not open to the public, even as open space, in 2013.

The parties have drawn our attention to nothing in the nexus study or any other part of the administrative record that sets forth explicitly why the nexus study categorized these areas differently than did the general plan, but a basis is discernible from the record. The nexus study shows that the value assigned to open space—73 percent of the value of improved parkland—represented solely the cost of land acquisition, not the cost of adding any improvements. The study explains that " 'standard park improvements' " include "site improvements (curbs, gutters, water, sewer, and electrical access), plus basic park and field amenities such as outdoor ball courts, restrooms, parking, basic play equipment, irrigation, turf, open green space, pedestrian paths, and picnic tables." One of Boatworks's trial exhibits, the City's Parks Improvement Assessment, shows that Shoreline Park has some of these improvements, such as benches, picnic areas, rest rooms, play areas, lighting, and an exercise path, and the model airplane field has two dedicated flying circles, picnic areas, work benches, and fencing. The 1999 application for surplus land indicates these boat launches, model airplane park, and Shoreline Park are developed, rather than undeveloped, open space. Thus, the record indicates the value of these facilities exceeds the cost of the land.

Boatworks relies on cases decided in other contexts indicating that if a public entity changes its view, it must explain its rationale. (See, e.g., *Motor Vehicle Mfrs. Assn., Inc. v. State Farm Mut.* (1983) 463 U.S. 29, 33–34, 57 (*State Farm*) [rescission of automobile passive restraint standards arbitrary and capricious where agency failed to present adequate basis and explanation for action]; *National Assn. of State Util. Consumer Advocates v. FCC* (11th Cir. 2006) 457 F.3d 1238, 1253 (*National Assn.*) [wireless carrier billing practices; unexplained inconsistency in agency's interpretation of statute is " 'arbitrary and capricious change from agency practice' "].) But the purpose of this portion of the nexus study was different from that of the general plan—that is, its purpose was to determine the *cost* of developing park and recreation facilities. It would have been preferable for the City to explain why it treated certain "Community Open Space" areas as parkland in its cost analysis. But on this record, we cannot conclude its

11

methodology on this point was "arbitrary, capricious or entirely lacking in evidentiary support." (See *Garrick*, *supra*, 3 Cal.App.4th at p. 328.)

## C. Boatworks's Cross-Appeal

### 1. *Existing Deficiencies in Park Facilities*

In its cross-appeal, Boatworks raises two additional challenges. First, it contends the trial court erred in rejecting its argument that the development impact fees are improperly designed to remedy existing deficiencies in park facilities.

Section 66001, subdivision (g) provides: "A fee shall not include the costs attributable to existing deficiencies in public facilities, but may include the costs attributable to the increased demand for public facilities reasonably related to the development project in order to (1) refurbish existing facilities to maintain the existing level of service or (2) achieve an adopted level of service that is consistent with the general plan." Boatworks points out that the City had previously identified, longstanding, deficiencies in park service to some areas of the city and an inadequate supply of athletic fields; because the City intends to use the fees to correct those deficiencies, Boatworks argues, they violate the Mitigation Fee Act.[6]

We are unpersuaded. In adding subdivision (g) of section 66001, the Legislature declared its intent to codify the holdings of *Bixel Association v. City of Los Angeles* (1989) 216 Cal.App.3d 1208 (*Bixel*); *Rohn v. City of Visalia* (1989) 214 Cal.App.3d 1463 (*Rohn*); and *Shapell*, *supra*, 1 Cal.App.4th 218. (Stats. 2006, ch. 194, § 2, p. 1940.) In *Bixel*, the appellate court considered a challenge to fire hydrant fees imposed as a condition of issuing a building permit, and concluded the fees were invalid because there were no safeguards limiting their use to the burden of new development; in particular, the city planned to attribute the cost of replacing a 97-year-old water main to the applicant's project, although the water main should have been replaced 47 years previously. (*Bixel,*

---

[6] The parties disagree about whether it is proper for us to consider evidence of these pre-existing deficiencies, which is not contained in the administrative record, and whether the City forfeited its challenge to the evidence. But the admissibility of this evidence is not crucial to our decision and we need not decide that issue.

12

at p. 1220.)  The court in *Rohn* concluded that a city could not properly condition approval of a development on dedication of 14 percent of its land for realignment of an intersection because the record showed the change in the use of the property would not impose a significant traffic burden, and the dedication was merely a means of implementing long-planned traffic improvements.  (*Rohn*, at p. 1476.)  And in *Shapell*, the court concluded a school district could not properly impose on new development the full cost of new schools, rather than allocating the amount of increased enrollment that was attributable to the new development.  (*Shapell*, at pp. 234–239.)  The court noted, however, that the fees could properly be used to refurbish old facilities to maintain a similar level of service.  (*Id*. at p. 239.)

Thus, in each of the cases cited by the Legislature in enacting subdivision (g) of section 66001, there was no nexus between the fees imposed and the burden of the new development.  We have already concluded that, in two respects, the City failed to establish a reasonable relationship between the fee charged and the burden of new development.  To the extent Boatworks's argument is that fees must have such a relationship to the burdens of new development, we agree.

However, Boatworks appears to go further and argue the fees may not be applied to address any existing problems with park facilities.  Taken to its logical conclusion, this argument would mean that a city could not impose development impact fees if there is any shortfall in its current facilities, because the effect of using the fees would necessarily be to ameliorate the shortfall.  We do not read the statute so broadly as to prohibit the city from imposing fees to maintain its current level of service.  The new residents will use not only the new parks and fields, but all of the existing park facilities, which they did not pay to build.  At the same time, they will increase the demand on the City's parklands; to the extent the new athletic fields and other facilities are necessary to maintain the existing level of service, the cost of building them is attributable not "to existing deficiencies in public facilities" (§ 66001, subd. (g)), but rather to the increased demand from new residents.

13

Nor is the City limited to its current offering and proportions of types of facilities; as explained in *City of Lemoore*, "There is no question that increased population due to new development will place additional burdens on the citywide community and recreation facilities. Thus, to maintain a similar level of service to the population, new facilities will be required. It is logical to not duplicate the existing facilities, but rather, to expand the recreational opportunities." (*City of Lemoore*, *supra*, 185 Cal.App.4th at p. 565.) As long as the fees are otherwise proper, the City may use them to meet needs it had already identified.

2. *Allocation of Cost of Alameda Point Sports Complex*

In 2001, the City prepared a development fee nexus study that planned for a list of 21 proposed parks and recreation improvements, including a sports complex at Alameda Point. The 2001 study determined that new development should be responsible for 8.1 percent of the cost of these improvements. It explained, "The allocation of costs is based on new development's share of total population at buildout, which equals 8 percent."

The 2014 nexus study upon which the City relied in setting the fees at issue here took a different approach. It contained a list of eight "Preliminary Planned Park Facilities" that the development impact fees would fully fund. That list included the Alameda Point Sports Complex. The study explained that $10 million of its cost was allocated to the citywide impact fee and $10 million to the Alameda Point impact fees. Citing *State Farm*, *supra*, 463 U.S. 29 and *National Assn.*, *supra*, 457 F.3d at p. 1253, Boatworks contends the City was required to explain why it allocated the cost of the sports complex differently in the two nexus studies.

We are unpersuaded. *City of Lemoore* establishes that a city may use development impact fees to expand its recreational opportunities, and need identify the public improvements only generally. (*City of Lemoore*, *supra*, 185 Cal.App.4th at p. 565.) As long as fees are properly calculated and imposed, we can think of no reason that the City should be confined to contemplating the same plan for new facilities in 2014 as it did in 2001 or that it should be required to allocate the fees to the same projects in the same amounts.

14

### D. Remedy

Having concluded that, in two respects, the trial court was correct in finding the City did not show an adequate basis for its fees, we now come to the remedy.  The trial court issued a peremptory writ of mandamus directing the City to "comply with the December 1, 2016 Order of this Court . . . by excising and vacating those portions of CITY Ordinance No. 3098 (Citywide Development Impact Fees) that concern or purport to authorize development impact fees for parks and recreation[]."

The City contends the trial court lacked jurisdiction to compel it to perform the legislative act of vacating and excising portions of the ordinance.  We agree that the correct resolution is to declare the ordinance void or invalid to the extent it sets the parks and recreation fees, rather than directing the City to perform a legislative act.

" 'Generally, a court is without power to interfere with a purely legislative action, in the sense that it may not command or prohibit legislative acts, whether the act contemplated or done be at the state level [citation] or at the local level [citation].  The reason for this is a fundamental one—it would violate the basic constitutional concept of separation of powers among the three coequal branches of the government.' "  (*City of Palo Alto v. Public Employment Relations Bd.* (2016) 5 Cal.App.5th 1271, 1310 (*City of Palo Alto*); see *Board of Supervisors v. California Highway Commission* (1976) 57 Cal.App.3d 952, 961 ["Mandamus will not lie to compel a legislative body to perform legislative acts in a particular manner"]; see also *Butt v. State of California* (1992) 4 Cal.4th 668, 695-696 ["principles of comity and separation of powers place significant restraints on courts' authority to order or ratify acts normally committed to the discretion of other branches or officials," and "[a] court should always strive for the least disruptive remedy adequate to its legitimate task"].)  In *City of Palo Alto*, the California Public Employment Relations Board directed a city council to rescind a resolution proposing a ballot measure to repeal binding arbitration, because it had failed to comply with a statutory requirement that it first consult with the board.  (*City of Palo Alto*, at pp. 1278–1279.)  The appellate court concluded the doctrine of separation of powers barred the board from ordering the city council to rescind a resolution, stating, "If a passed

15

resolution is legislative in nature, it necessarily follows that rescinding the resolution is similarly legislative in nature." (*Id*. at p. 1313.) However, " 'undoing' the erroneously passed legislation can be accomplished by means that are not offensive to the separation of powers doctrine," for instance by declaring legislation void or invalidating it. (*Id*. at p. 1315.)

Based on these principles, we conclude the court may not direct the City to carry out the legislative act of rescinding an ordinance, when the less invasive remedy of invaliding or voiding the ordinance, to the extent it violates the law, is available. On remand, the trial court shall issue a judgment declaring the parks and recreation fee as imposed invalid and unenforceable. The City, of course, retains discretion to impose fees that are consistent with the Mitigation Fee Act and the views expressed in this opinion.

### E. Attorney Fees

After trial, Boatworks moved for attorney fees pursuant to Code of Civil Procedure section 1021.5, which authorizes an award of attorney fees to a successful party "in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any." The trial court granted the motion and awarded attorney fees of $558,052.50 against the City. The City contends Boatworks is not entitled to these fees.

" 'Under the private burden prong of section 1021.5, fees are recoverable " 'when the cost of the claimant's legal victory transcends his personal interest, that is, when the necessity for pursuing the lawsuit placed a burden on the plaintiff "out of proportion to his individual stake in the matter." ' " [Citation.] "If the enforcement of the public interest is merely 'coincidental to the attainment of . . . personal goals' [citation] or is 'self-serving,' [citation], then this requirement is not met.' [Citation.]" Stated otherwise, 'The private attorney general doctrine . . . was not intended to reward litigants motivated

16

by their own pecuniary interests who only coincidentally protect the public interest.' " (*Lyons v. Chinese Hospital Assn.* (2006) 136 Cal.App.4th 1331, 1348.)  We review an attorney fee award under Code of Civil Procedure section 1021.5 for abuse of discretion. " ' "Whether the statutory requirements have been satisfied so as to justify a fee award is a question committed to the [sound] discretion of the trial court, unless the question turns on statutory construction, which we review de novo." ' "  (*Heron Bay Homeowners Assn. v. City of San Leandro* (2018) 19 Cal.App.5th 376, 386 (*Heron Bay*).)

We have concluded that the trial court erred in two respects only, that is, in concluding the City could not permissibly treat Shoreline Park, the model airplane field, and the two boat ramps as parkland rather than open space, and in fashioning its remedy. The City argues that if we reverse the judgment below, we must also reverse the attorney fee award, because it " 'falls with a reversal of the judgment on which it is based.' " (*California Grocers Assn. v. Bank of America* (1994) 22 Cal.App.4th 205, 220.)  But where, as here, there is a *limited* reversal, we remand for the trial court to consider anew the propriety of attorney fees *unless* we can say with certainty the court would have exercised its discretion the same way had the successful party not prevailed on the issue on which we reverse.  (*Ventas Finance I, LLC v. Franchise Tax Bd.* (2008) 165 Cal.App.4th 1207, 1233–1235; see *Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1097.)  Here, the substantive issue on which we reverse affects only a minor part of the proposed development impact fees.  The trial court referred to the potential fees relating to the City's miscategorization of open space as "not a large dollar item."  We see no likelihood the trial court would have exercised its discretion differently in the absence of this error.  We shall therefore consider the merits of the City's challenge to the fee award.

The City does not dispute that Boatworks was a successful party, and there is no monetary recovery from which attorney fees could be paid.  (See Code Civ. Proc., § 1021.5.)  The City disputes that a significant benefit has been conferred on the general public or a large class of persons and that the necessity and financial burden of private enforcement make the award appropriate.  (*Ibid*.)

17

In our view, the trial court could reasonably conclude the litigation conferred a significant benefit on the general public or a large class of persons. The Mitigation Fee Act was enacted to respond to concerns that local agencies were imposing fees " 'for purposes unrelated to development projects.' " (*Ehrlich*, *supra*, 12 Cal.4th at p. 864.) The public has an interest in public agencies complying with this legislative objective. (See *Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 939 [significant benefit may be found in effectuation of fundamental statutory policy]; *Keep Our Mountains Quiet v. County of Santa Clara* (2015) 236 Cal.App.4th 714, 737; see also *Environmental Protection Information Center v. Department of Forestry & Fire Protection* (2010) 190 Cal.App.4th 217, 235 [litigation conferred significant benefit where it required resubmitted sustained yield plan that would more accurately analyze impacts of proposed project]; *Folsom v. Butte County Assn. of Governments* (1982) 32 Cal.3d 668, 684 [attorney fees proper where plaintiff vindicated legislative intent in action that redirected funds to purpose for which they were designated].)

There is also evidence from which the court could conclude a large class of persons will benefit from the decision. The development impact fees are intended to apply to all development anticipated from 2014 through 2040. The portion of the fees attributable to parks and recreation amounts to $11,528 for single family homes and $9,149 for multi-family units, and Boatworks provided expert evidence that in a high-priced market such as the Bay Area, home builders are able to pass on to the buyer most or all of the cost of increased development impact fees. The evidence supports a conclusion that the litigation will provide a benefit to developers and buyers of an estimated 4,600 homes over the course of more than 25 years.

The record is also sufficient to support a conclusion that the necessity and burden of private enforcement make the award appropriate. This requirement " ' "really examines two issues: whether private enforcement was necessary and whether the financial burden of private enforcement warrants subsidizing the successful party's attorneys." ' " (*Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1214–1215.) In this

18

action against the public entity that is responsible for setting development impact fees, the need for private enforcement is clear. (See *id*. at p. 1215.)

In considering the second prong of this inquiry, financial burden on litigants, courts focus "not only on the costs of the litigation but also any offsetting financial benefits that the litigation yields or reasonably could have been expected to yield." (*Conservatorship of Whitley*, *supra*, 50 Cal.4th at p. 1215.) Financial incentives may exist even where—as here—the plaintiff seeks no monetary award in the litigation. (*Summit Media, LLC v. City of Los Angeles* (2015) 240 Cal.App.4th 171, 181, 192–194 [affirming denial of attorney fees where plaintiff company had significant financial stake in challenging validity of settlement agreement between its competitors and a city].) To weigh the costs and benefits, "[t]he trial court must first fix—or at least estimate—the monetary value of the benefits obtained by the successful litigants themselves. . . . Once the court is able to put some kind of number on the gains actually attained it must discount these total benefits by some estimate of the probability of success at the time the vital litigation decisions were made which eventually produced the successful outcome." (*Los Angeles Police Protective League v. City of Los Angeles* (1986) 188 Cal.App.3d 1, 9.) After approximating an estimated value of the case, the court then determines the cost of the litigation. (*Id*. at pp. 9-10.) Finally, the court "place[s] the estimated value of the case beside the actual cost and make[s] the value judgment whether it is desirable to offer the bounty of a court-awarded fee in order to encourage litigation of the sort involved in this case . . . . [A] bounty will be appropriate except where the expected value of the litigant's own monetary award exceeds by a substantial margin the actual litigation costs." (*Id*. at p. 10; accord *Conservatorship of Whitley*, *supra*, 50 Cal.4th at p. 1216.)

Boatworks owns property in the City that it, or the previous owner of the property, has been seeking to develop since at least 2005. The most recent application is for a 182-unit residential housing project.[7] If the City approves the project, Boatworks would be

---

[7] The City rejected that application in 2016, and it is currently the subject of a separate lawsuit. We have previously considered an appeal related to that lawsuit. (*Boatworks v. City of Alameda, et al.* (Mar. 5, 2019, A150276) [nonpub. opn.].)

liable for park impact fees of approximately $1.6 million. Boatworks submitted evidence that it made multiple applications to develop the property, to no avail, and that at the time it began this litigation, it estimated there was no more than a 50 percent chance the City would ever approve any economically viable project on the property. Its attorney submitted a declaration stating that at the time this litigation was filed—before he received evidence from the City during discovery—he estimated the likelihood of success in this litigation was also 50 percent.

Based on this evidence, the trial court could reasonably approximate the estimated value of the case as being lower than the $558,052.50 in attorney fees. Any financial benefit Boatworks might receive is "at least once removed from the results of the litigation," because the ruling did not ensure Boatworks would receive the financial benefit of any reduction in the fees. (*Heron Bay*, *supra*, 19 Cal.App.5th at p. 395; see *Galante Vineyards v. Monterey Peninsula Water Management Dist.* (1997) 60 Cal.App.4th 1109, 1127–1128 [no abuse of discretion in awarding fees where petitioners received no direct pecuniary benefit from judgment and "any future money advantage for petitioners is speculative"].) "Where personal benefits are a step removed from the results of the litigation, the potential financial benefit is indirect and speculative, and thus, a trial court does not abuse its discretion in concluding that the financial burden criterion is satisfied for purposes of [Code of Civil Procedure] section 1021.5." (*People v. Investco Management & Development LLC* (2018) 22 Cal.App.5th 443, 470.) It would not be unreasonable for the court to discount Boatworks's financial interest in the case based on *both* the fact that any financial benefit was speculative (since no project had yet been approved and there was no certainty Boatworks would ever be liable for development impact fees) *and* the fact that success in this litigation was uncertain at the time it was filed. Weighing these risks, the expected value of the litigation at filing would be $400,000 ($1.6 million x 0.5 x 0.5). Moreover, this likely overstated the financial benefit to Boatworks of the judgment in its favor because the City will presumably react to our decision by adopting a new impact fee for park facilities that

20

complies with the Mitigation Fee Act and that Boatworks will have to pay if its project is ever developed.

The City argues that Boatworks failed to show that the litigation imposed a burden on it out of proportion to its financial interest. (See *Save Oxnard Shores v. California Coastal Com.* (1986) 179 Cal.App.3d 140, 154.) The City discusses at length the history of the disputes between the parties, and contends Boatworks brought this action at least in part to gain an advantage in its negotiations with the City. It points out that Boatworks offered to dismiss this litigation and waive all future challenges to the City's development fees in exchange for the City's agreement to expedite processing of a revised tentative map for Boatworks's property, pay $480,00 in fee credits, and cooperate with Boatworks's efforts to get an additional $4 million in redevelopment funding from the State. The City contends this action is merely one part of Boatworks's overall litigation strategy and that its financial value to Boatworks cannot be considered in isolation. And, the City argues, because Boatworks provided no evidence of the financial value of its disputes with the City as a whole, it did not meet its burden to show it is entitled to attorney fees under Code of Civil Procedure section 1021.5.

On this record, the facts the City cites do not compel reversal. The global settlement discussions led nowhere, and any settlement leverage this litigation provided was limited by the economic value of this particular dispute. The trial court did not abuse its discretion in deciding to ignore the potential value of all of Boatworks's disputes with the City before awarding attorney fees.

### III. DISPOSITION

The judgment is reversed to the extent it (1) finds the City could not properly include Shoreline Park, Bill Osborne Model Airplane Field and the two boat ramps in its inventory of parks and (2) directs the City to excise and vacate portions of Ordinance No. 3098 that concern or purport to authorize development fees for parks and recreation. On remand, the trial court shall issue a judgment declaring the Ordinance's parks and recreation fee invalid and unenforceable. The judgment is otherwise affirmed. The matter is remanded to the trial court for further proceedings consistent with this opinion.

21

The April 20, 2017 order awarding attorney fees is affirmed.

The parties shall bear their own costs on appeal.

_____
TUCHER, J.


WE CONCUR:


_____
POLLAK, P. J.


_____
STREETER, J.


*Boatworks, LLC v. City of Alameda et al* (A151063, A151919)

23

Trial Court:                               Alameda County Superior Court

Trial Judge:                              Hon. Frank Roesch

Counsel for Appellants:             Jarvis, Fay, Doporto & Gibson, Rick Jarvis; and Janet C. Kern, City Attorney; Alan M. Cohen, Assistant City Attorney

Counsel for Respondents:          Thomas D. Roth