Filed 7/29/25
Opinion on remand from the U.S. Supreme Court

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| GEORGE SHEETZ, | C093682 |
| Plaintiff and Appellant, | (Super. Ct. No. PC20170255) |
| v. | |
| COUNTY OF EL DORADO, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of El Dorado County, Dylan M. Sullivan, Judge.  Affirmed.

Pacific Legal Foundation, Brian T. Hodges, David J. Deerson; Pierson Ferdinand, Paul James Beard II; FisherBroyles and Matthew Howard Weiner for Plaintiff and Appellant.

Jackson Maynard, Sam Spielgelman; and Timothy R. Snowball for Citizen Action Defense Fund, Building Industry Association of Washington, Manhattan Institute,

1

Wallace Properties, Inc., Washington Business Properties Association and Soundbuilt Homes LLC as Amici Curiae on behalf of Plaintiff and Appellant.

Pillsbury Winthrop Shaw Pittman, Blaine I. Green and Nathan J. Wexler for Charles Gardner and Emily Hamilton as Amici Curiae on behalf of Plaintiff and Appellant.

Rutan & Tucker, David P. Lanferman and Jayson A. Parsons for California Building Industry Association and National Association of Home Builders as Amici Curiae on behalf of Plaintiff and Appellant.

Abbott & Kindermann, William W. Abbott, Glen C. Hansen; David Anthony Livingston and Kathleen A. Markham, Deputy County Counsel, for Defendant and Respondent.

Rob Bonta, Attorney General, Daniel A. Olivas, Assistant Attorney General, Haley Peterson, Matthew T. Struhar and Andrew R. Contreiras, Deputy Attorneys General, for the Attorney General of California as Amicus Curiae on behalf of Defendant and Respondent.

David Chiu, City Attorney, Austin M. Yang and Kristen Ann Jensen for the City and County of San Francisco, League of California Cities, California State Association of Counties, International Municipal Lawyers Association and the California Chapter of the American Planning Association as Amici Curiae on behalf of Defendant and Respondent.

This case returns to us from the United States Supreme Court, after that court invalidated settled California law regarding the application of the takings clause of the Fifth Amendment to the Constitution of the United States, on which we had relied in our original opinion. After analyzing the dispute before us in the manner now mandated by our nation's highest court, we again affirm the judgment, as we next explain.

Development impact fees are a widely used method for local governments to finance public infrastructure improvements necessary to serve new growth in their community. In California, local governments have broad authority, under the grant of police power in the state Constitution, to regulate the development and use of real property within their jurisdiction to promote the public welfare, which includes the power to require landowners to pay a fee to mitigate the public impacts of their proposed

2

development projects as a condition of approval.  (See Cal. Const., art. XI, § 7; *California Building Industry Assn. v. City of San Jose* (2015) 61 Cal.4th 435, 455-460 (*California Building*).)

Before us is a constitutional challenge to a development impact fee brought under the Fifth Amendment's takings clause, which prohibits the government from taking private property for public use without just compensation.  (U.S. Const., 5th Amend.)  More specifically, we address the special application of the "unconstitutional conditions doctrine" in the context of land-use exactions--government-imposed conditions for obtaining a building permit--established in *Nollan v. California Coastal Commission* (1987) 483 U.S. 825 (*Nollan*) and *Dolan v. City of Tigard* (1994) 512 U.S. 374 (*Dolan*).

Plaintiff George Sheetz wanted to build a single-family home on his residential parcel of land in Placerville.  As a condition of receiving a building permit, defendant El Dorado County (County) required him to pay $23,420 to mitigate local traffic congestion spurred by new development.  Sheetz paid the fee under protest and obtained the permit.

In 2017, Sheetz brought suit against the County, challenging the validity of the traffic impact mitigation fee (TIM fee, impact fee, or fee).  Among other things, Sheetz claimed the fee was an unlawful taking of property ("exaction" of money) under the takings clause.[1]  In Sheetz's view, the "essential nexus" and "rough proportionality" standards announced in *Nollan* and *Dolan* (commonly referred to as "the *Nollan*/*Dolan* test") required the County to make an individualized determination that the fee amount ($23,420) was necessary to offset traffic congestion attributable to his specific development.  The County's predetermined fee schedule (set forth in the planning document called the "General Plan"), Sheetz argued, failed to meet that requirement.  In other words, Sheetz claimed the County violated the takings clause by improperly

---

[1]  Sheetz also challenged the TIM fee under state law.  At this juncture, the only remaining issue is whether the fee violates the federal takings clause.

"leveraging" its land use "permitting monopoly" in an extortionate fashion to exact more private property (money) than was necessary to mitigate the public impacts (increased traffic congestion) from his proposed development project. According to Sheetz, the County unlawfully deployed its police power to regulate land use by leveraging its interest in mitigating traffic congestion to pursue governmental ends that lacked an "essential nexus" and "rough proportionality" to that public interest, resulting in a taking without just compensation in violation of the Fifth Amendment.

In 2022, in a published opinion, we agreed with the trial court that the challenged permit condition (TIM fee) did not violate the takings clause as a matter of law, and therefore affirmed the resulting judgment after the trial court dismissed Sheetz's federal takings claim without leave to amend and denied his verified petition for writ of mandate. (See *Sheetz v. County of El Dorado* (2022) 84 Cal.App.5th 394, 401, 410, 414, 417, vacated and cause remanded by *Sheetz v. County of El Dorado, California* (2024) 601 U.S. 267, 273 (*Sheetz*).) In so ruling, we relied on longstanding precedent from the California Supreme Court, which held that the requirements of *Nollan* and *Dolan* did not apply where (as here) the challenged impact fee was a legislatively imposed permit condition that generally applied to a broad class of permit applicants through formulas or schedules that assessed the impact of entire classes of development (e.g., single-family residential, commercial). Rather, under established California law, the *Nollan/Dolan* test only applied to an impact fee that targeted a particular development and was imposed on an ad hoc and discretionary basis upon an individual permit applicant through administrative action (i.e., government agency action). (See *Sheetz v. County of El Dorado*, *supra*, 84 Cal.App.5th at pp. 410, 414 [citing cases].) The California Supreme Court denied review.

In 2023, the United States Supreme Court[2] granted certiorari to resolve the split among the state courts on the question of whether the Fifth Amendment's takings clause "recognizes a distinction between legislative and administrative conditions imposed on land-use permits." (*Sheetz, supra,* 601 U.S. at p. 273.) In 2024, the Supreme Court held that the requirements of *Nollan* and *Dolan* apply to land-use exactions (including impact fees) imposed by legislators *and* administrators, meaning that the takings clause "prohibits legislatures and agencies alike from imposing unconstitutional conditions on land-use permits." (*Id*. at pp. 279-280.) In other words, the Supreme Court concluded that, contrary to settled California law, "conditions on building permits are not exempt from scrutiny under *Nollan* and *Dolan* just because a legislature imposed them." (*Ibid*.) The Supreme Court opined that the rule on which we relied--a legislative exception to the ordinary takings rules--"finds no support in constitutional text, history, or precedent." (*Id*. at p. 280; see *id*. at pp. 276-279 [discussing the text as well as the relevant history and precedent of the takings clause].) Accordingly, because the analysis in our prior opinion "proceeded from the erroneous premise that legislative permit conditions are categorically exempt from the requirements of *Nollan* and *Dolan*," the Supreme Court vacated the federal takings portion of our prior opinion and remanded the matter for further proceedings. (*Id*. at p. 280.)

Upon further analysis as directed by the Supreme Court, we now conclude that the challenged permit condition (TIM fee) does not constitute an unlawful monetary exaction under the *Nollan/Dolan* test. The legislatively formulated generally applicable impact fee is not an unconstitutional condition imposed on land use in violation of the Fifth Amendment's takings clause. Accordingly, we again affirm the judgment.

---

[2] Unless otherwise specified, all further "Supreme Court" references are to the United States Supreme Court.

## FACTUAL AND PROCEDURAL BACKGROUND

Given the procedural posture of this case, we briefly summarize the underlying facts and procedure, which we take from *Sheetz, supra*, 601 U.S. 267. Additional information related to Sheetz's federal takings claim is set forth as necessary in the Discussion section, *post*.

*Factual Background*

"El Dorado County, California is a rural jurisdiction that lies east of Sacramento and extends to the Nevada border. Much of the County's 1,700 square miles is backcountry. It is home to the Sierra Nevada mountain range and the Eldorado National Forest. Those areas, composed mainly of public lands, are sparsely populated. Visitors from around the world use the natural areas for fishing, backpacking, and other recreational activities.

"Most of the County's residents are concentrated in the west and east regions. In the west, the towns of El Dorado Hills, Cameron Park, and Shingle Springs form the outer reaches of Sacramento's suburbs. Placerville, the county seat, lies just beyond them. In the east, residents live along the south shores of Lake Tahoe. Highway 50 connects these population centers and divides the County into north and south portions.

"In recent decades, the County has experienced significant population growth, and with it an increase in new development. To account for the new demand on public services, the County's Board of Supervisors adopted a planning document, which it calls the General Plan, to address issues ranging from wastewater collection to land-use restrictions. The Board of Supervisors is a legislative body under state law, and the adoption of its General Plan is a legislative act. [Citation.]

"To address traffic congestion, the General Plan requires developers to pay a traffic impact fee as a condition of receiving a building permit. The County uses proceeds from these fees to fund improvements to its road system. The fee amount is determined by a rate schedule, which takes into account the type of development

6

(commercial, residential, and so on) and its location within the County. The amount is not based on 'the cost specifically attributable to the particular project on which the fee is imposed.' " (*Sheetz, supra*, 601 U.S. at pp. 271-272, fn. omitted.)

"Sheetz owns property in the center of the County near Highway 50, which the General Plan classifies as 'Low Density Residential.' Sheetz and his wife applied for a permit to build a modest prefabricated house on the parcel, with plans to raise their grandson there. As a condition of receiving the permit, the County required Sheetz to pay a traffic impact fee of $23,420, as dictated by the General Plan's rate schedule. Sheetz paid the fee under protest and obtained the permit. The County did not respond to his request for a refund." (*Sheetz, supra*, 601 U.S. at p. 272, fn. omitted.)

*Procedural Background*

"Sheetz sought relief in state court. He claimed, among other things, that conditioning the building permit on the payment of a traffic impact fee constituted an unlawful 'exaction' of money in violation of the Takings Clause. In Sheetz's view, [the Supreme Court's] decisions in *Nollan* . . . and *Dolan* . . . required the County to make an individualized determination that the fee amount was necessary to offset traffic congestion attributable to his specific development. The County's predetermined fee schedule, Sheetz argued, failed to meet that requirement. (*Sheetz, supra*, 601 U.S. at p. 272.)

"The trial court rejected Sheetz's claim and [a panel from this court] affirmed. Relying on precedent from the California Supreme Court, [we held] that the *Nollan/Dolan* test applies only to permit conditions imposed ' "on an individual and discretionary basis." ' [Citations.] Fees imposed on 'a broad class of property owners through legislative action,' [we] said, need not satisfy that test. [Citation.] The California Supreme Court denied review." (*Sheetz, supra*, 601 U.S. at p. 273.)

Because the state courts had "reached different conclusions on the question of whether the Takings Clause recognizes a distinction between legislative and

7

administrative conditions on land-use permits," the Supreme Court granted certiorari to resolve the split. (*Sheetz, supra*, 601 U.S. at p. 273 & fn. 3 [collecting cases].)

In 2024, the Supreme Court reversed our prior opinion, holding that the *Nollan/Dolan* test applies to legislative and administrative conditions on building permits. In other words, the court determined that, contrary to established California law, permit conditions are not exempt from scrutiny under *Nollan* and *Dolan* just because a legislature imposed them. (*Sheetz, supra*, 601 U.S. at pp. 276-280.) In so concluding, the court found that the takings clause applies equally to legislators and administrators, which means that it "prohibits legislatures and agencies alike from imposing unconstitutional conditions on land-use permits." (*Id.* at p. 279.)

The Supreme Court vacated the federal takings portion of our prior opinion and remanded the matter for further proceedings not inconsistent with its opinion. (*Sheetz, supra*, 601 U.S. at p. 280.) In doing so, the high court did not resolve the "important threshold question to any application of *Nollan/Dolan* scrutiny: whether the permit condition would be a compensable taking if imposed outside the permitting context." (*Id.* at pp. 280-281 (conc. opn. of Sotomayor, J.).) As explained by Justice Sotomayor: " 'A predicate for any unconstitutional conditions claim is that the government could not have constitutionally ordered the person asserting the claim to do what it attempted to pressure that person into doing.' [Citation.] In the takings context, *Nollan/Dolan* scrutiny therefore applies only when the condition at issue would have been a compensable taking if imposed outside the permitting process." (*Id.* at p. 281 (conc. opn. of Sotomayor, J.).) Thus, we must first decide whether the challenged permit condition (TIM fee) is subject to *Nollan/Dolan* scrutiny. (*Ibid*.) If the answer to that question is "yes," we must then determine whether the impact fee survives the *Nollan/Dolan* test, that is, whether the fee has an "essential nexus" to the County's land-use interest (reducing traffic congestion from new development), and whether the amount of the fee ($23,420) is roughly proportional to the proposed development's impact on that interest. (See *Sheetz*, at

8

pp. 275-276.) In making the latter determination, we must decide a question the Supreme Court explicitly declined to decide in *Sheetz*; namely, whether " 'a permit condition imposed on a class of properties must be tailored with the same degree of specificity as a permit condition that targets a particular development.' " (See *id.* at p. 284 (conc. opn. of Kavanaugh, J.).)

As noted by Justice Kavanaugh: "[T]oday's decision does not address or prohibit the common government practice of imposing permit conditions, such as impact fees, on new developments through reasonable formulas or schedules that assess the impact of classes of development rather than the impact of specific parcels of property. Moreover, as is apparent from the fact that today's decision expressly leaves the question open, no prior decision of this Court has addressed or prohibited that longstanding government practice. Both *Nollan* and *Dolan* considered permit conditions tailored to specific parcels of property. [Citations.] Those decisions had no occasion to address permit conditions, such as impact fees, that are imposed on permit applicants based on reasonable formulas or schedules that assess the impact of classes of development." (*Sheetz, supra*, 601 U.S. at p. 284 (conc. opn. of Kavanaugh, J.).)

After the Supreme Court issued the remittitur, the parties submitted supplemental briefing on the remaining issues in this matter and we granted various private and public entities permission to file amicus briefing. Briefing was completed in late November 2024, and the case was ultimately argued in June 2025.

## DISCUSSION

### I

### *Governing Law*

"When the government wants to take private property to build roads, courthouses, or other public projects, it must compensate the owner at fair market value." (*Sheetz, supra*, 601 U.S. at p. 273.) The just compensation requirement comes from the takings clause of the Fifth Amendment, made applicable to the states by the Fourteenth

9

Amendment, which provides that "private property shall not 'be taken for public use, without just compensation.' " (*Lingle v. Chevron U.S.A. Inc.* (2005) 544 U.S. 528, 536 (*Lingle*).) By requiring the government to pay for what it takes, the takings clause prevents the government from " 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' " (*Palazzolo v. Rhode Island* (2001) 533 U.S. 606, 618; *Armstrong v. United States* (1960) 364 U.S. 40, 49.)

The Supreme Court has identified two general categories of takings: "physical takings" and "regulatory takings." (*Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency* (2002) 535 U.S. 302, 321.) Apart from these two general categories of takings, the Supreme Court has also identified a "special" category of takings claims for "land-use exactions." (*Lingle, supra*, 544 U.S. at p. 546.) A land-use exaction occurs when the government demands real property or money from a land-use permit applicant as a condition of obtaining a building permit. (*Koontz v. St. Johns River Water Management Dist.* (2013) 570 U.S. 595, 599, 612, 616 (*Koontz*); see *City of Monterey v. Del Monte Dunes at Monterey, Ltd.* (1999) 526 U.S. 687, 702 [explaining that exactions are "land-use decisions conditioning approval of development on the dedication of [private] property to public use"].) The leading examples of land-use "exactions" come from the Supreme Court's decisions in *Nollan*, *Dolan*, and *Koontz*.

In *Nollan*, the California Coastal Commission conditioned its grant of a permit to landowners who sought to rebuild their house on their agreement to dedicate a public easement across their beachfront property. (*Nollan, supra*, 483 U.S. at p. 827.) In *Dolan*, a city conditioned its grant of a permit to a property owner who sought to increase the size of her existing retail business and pave her parking lot on her agreement to dedicate a portion of her property for flood control and traffic improvements. (*Dolan*, *supra*, 512 U.S. at p. 377.) And most recently in *Koontz*, a water district conditioned its grant of a permit to a landowner who sought to develop 3.7 acres of an undeveloped property on

his agreement to either reduce the size of his development to 1 acre and dedicate a conservation easement on the remainder of the property (13.9 acres) or proceed with the development as proposed, building on 3.7 acres and deeding a conservation easement on the remainder of the property (11.2 acres), and pay money to improve certain public wetlands the water district owned. (*Koontz*, *supra*, 570 U.S. at pp. 601-602.)

To determine whether these types of demands (i.e., land-use exactions) are impermissible, courts apply a "special application of the 'doctrine of "unconstitutional conditions." ' " (*Lingle, supra*, 544 U.S. at p. 547.) Under that doctrine, the government may not ask a person to give up a constitutional right (e.g., the right to receive just compensation when private property is taken for a public use) "in exchange for a discretionary benefit conferred by the government where the benefit sought has little or no relationship to the property." (*Dolan, supra*, 512 U.S. at p. 385.) In applying the doctrine in the context of land-use exactions, particular rules apply because of two competing realities surrounding land-use permits. On the one hand, the government can take unreasonable advantage of landowners who seek a permit. "By conditioning a building permit on the owner's deeding over a public right-of-way, for example, the government can pressure an owner into voluntarily giving up property for which the Fifth Amendment would otherwise require just compensation." (*Koontz, supra*, 570 U.S. at p. 605.) On the other hand, the government often has legitimate interests in controlling or mitigating the effects of a particular development project. For example, where a building proposal would substantially increase traffic congestion, a local government might condition permit approval on the owner's agreement to deed over the land needed to widen a public road. (*Ibid*. [describing permit conditions of this nature --conditions that insist landowners "internalize the negative externalities of their conduct"--as "a hallmark of responsible land-use policy," and noting that the Supreme Court has "long sustained such regulations against constitutional attack"]; see also *Sheetz, supra*, 601 U.S. at p. 275

11

[observing that the "government is entitled to put the landowner to the choice of accepting the bargain or abandoning the proposed development"].)

But the Supreme Court has found that permitting conditions may sometimes go too far and make extortionate demands on land-use permit applicants--a group the court has found "especially vulnerable to the type of coercion that the unconstitutional conditions doctrine prohibits because the government often has broad discretion to deny a permit that is worth far more than property it would like to take." (*Koontz*, *supra*, 570 U.S. at p. 605.) *Extortionate* demands for property (including money) made by the government when owners apply for land-use permits, "frustrate the Fifth Amendment right to just compensation, and the unconstitutional conditions doctrine prohibits them." (*Ibid*..) "Extortionate demands for property in the land-use permitting context run afoul of the Takings Clause not because they take property but because they impermissibly burden the right not to have property taken without just compensation. As in other unconstitutional conditions cases in which someone refuses to cede a constitutional right in the face of coercive pressure, the impermissible denial of a governmental benefit is a constitutionally cognizable injury." (*Id*. at p. 607.)

To accommodate the competing realities surrounding land-use permits and ensure against extortionate demands against building permit applicants, *Nollan* and *Dolan* establish that the government may condition approval of a land-use permit on the landowner's agreement to dedicate a portion of his private property to the public "so long as there is a 'nexus' and 'rough proportionality' between the property that the government demands and the social costs of the [landowner's] proposal." (*Koontz*, *supra*, 570 U.S. at pp. 605-606 [explaining that dedications of private property (e.g., deeding over land needed to widen a public road) can offset proposed land uses that threaten to impose costs on the public].) Put another way, "[u]nder *Nollan* and *Dolan* the government may choose whether and how a permit applicant is required to mitigate the impacts of a proposed development, but it may not leverage its legitimate interest in

12

mitigation to pursue governmental ends that lack an essential nexus and rough proportionality to those impacts." (*Id.* at p. 606 [explaining that the government may insist that permit applicants bear the full costs of their proposed development projects, but the Fifth Amendment right to just compensation forbids the government from "engaging in 'out-and-out . . . extortion' "].)

As noted *ante*, the requirements established in *Nollan* and *Dolan* for evaluating takings claims in the context of land-use exactions are commonly referred to as the "*Nollan/Dolan* test," which is viewed as a type of "heightened" or intermediate scrutiny. (See *California Building, supra*, 61 Cal.4th at pp. 457-459, 470; *Beach & Bluff Conservancy v. City of Solana Beach* (2018) 28 Cal.App.5th 244, 266.) The *Nollan* part of the test is the "essential nexus" standard. That component asks whether there is an "essential nexus" or logical connection between the government's legitimate state interest and the permit condition; the required condition (e.g., impact fee) must be imposed because of the costs associated with the state interest (e.g., reduction of traffic congestion) and not for other reasons. (See *Nollan, supra*, 483 U.S. at pp. 834-837; see also *Sheetz, supra*, 601 U.S. at p. 275 ["permit conditions must have an 'essential nexus' to the government's land-use interest"].)

The *Dolan* part of the test is the "rough proportionality" standard. That component concerns the "degree of connection" between the permit condition and the projected public impacts or social costs of the proposed development project. (*Dolan, supra*, 512 U.S. at p. 386; see also *Sheetz, supra*, 601 U.S. at pp. 275-276 ["permit conditions must have ' "rough proportionality" ' to the development's impact on the [government's] land-use interest"].) "No precise mathematical calculation is required, but the [government] must make *some sort of individualized determination* that the [land-use exaction] is related both in nature and extent to the impact of the proposed development." (*Dolan,* at p. 391, italics added.) In other words, the government "must make *some effort to quantify its findings*" in support of the required private property

13

dedication beyond mere conclusory statements. (*Id*. at pp. 395-396, italics added.) As the Supreme Court has explained, the requirements of *Nollan* and *Dolan* are meant to "ensure[ ] that the government is acting to further its stated purpose, not leveraging its permitting monopoly to exact private property without paying for it" (*Sheetz*, at p. 275), and to prevent the government from imposing a permit condition that "requires a landowner to give up more than is necessary to mitigate harms resulting from new development" (*id.* at p. 276).

In *Koontz*, the Supreme Court extended the *Nollan/Dolan* test to "so-called 'monetary exactions' " demanded by the government as a substitute for the dedication of real property to mitigate the impact of a proposed development project. (*Koontz*, *supra*, 570 U.S. at pp. 612, see also p. 619.) Because these " 'in lieu of' fees are utterly commonplace" and "functionally equivalent to other types of land use exactions," the Supreme Court has concluded that they too must satisfy the "essential nexus" and "rough proportionality" requirements of *Nollan* and *Dolan*. (*Id.* at p. 612.)

While local governments in California have substantial authority to regulate land-use (see Cal. Const., art. XI, § 7; *Big Creek Lumber Co. v. County of Santa Cruz* (2006) 38 Cal.4th 1139, 1151-1152), the federal taking clause's right to just compensation coexists with their power to engage in land-use planning (see *Sheetz, supra*, 601 U.S. at p. 274). In *Sheetz*, the Supreme Court recently clarified that, in the land-use permitting context, the takings clause "constrains the government *without any distinction between legislation and other official acts*," meaning that land-use exactions imposed as a condition of development by a legislative body and other branches of government (administrative agencies) "stand on equal footing." (See *id*. at p. 277 [explaining that the " 'essential question' " is whether the government has taken private property, not whether the " 'government action at issue comes garbed as a regulation (or statute, or ordinance, or miscellaneous decree),' " (*id*. at p. 278)].)

14

*Takings Clause Claim*

Sheetz argues the challenged permit condition (TIM fee) effects an unlawful taking of private property without just compensation under the special application of the "unconstitutional conditions" doctrine established in *Nollan* and *Dolan*. He contends the fee imposed by the County as a condition for approving a permit to build a single-family home on his residential parcel constituted an unconstitutional monetary exaction under the Fifth Amendment's takings clause because: (1) the fee lacks an "essential nexus" or logical connection to the County's land-use interest (reducing traffic congestion from new development); and (2) the amount of the fee ($23,420) is not roughly proportional to the projected public burdens or social costs (increase in traffic congestion) attributable to his development project.

A. *Antecedent Question*

We begin our analysis by addressing the threshold or antecedent question Justice Sotomayor identified in her concurring opinion in this case. In the land-use regulation context, the requirements of *Nollan* and *Dolan* apply only when the permit condition at issue (e.g., easement, impact fee) would have been a compensable taking if imposed by the government outside the permitting process. (See *Sheetz, supra*, 601 U.S. at pp. 280-281 (conc. opn. of Sotomayor, J.), citing *Koontz, supra*, 570 U.S. at p. 612; see also *California Building, supra*, 61 Cal.4th at pp. 459-460.) As recognized by the Supreme Court in *Koontz*: "A predicate for any unconstitutional conditions claim is that the government could not have constitutionally ordered the person asserting the claim to do what it attempted to pressure that person into doing." (*Koontz*, at p. 612 ["[W]e began our analysis in both *Nollan* and *Dolan* by observing that if the government had directly seized the easements it sought to obtain through the permitting process, it would have committed a *per se* taking"]; see *Nollan, supra*, 483 U.S. at p. 831 [noting that a taking would have occurred had the government simply required the landowners to make an

easement across their beachfront lot available to the public on a permanent basis in order to increase public access to the beach, rather than conditioning their permit to rebuild their house on their agreeing to do so]; *Dolan, supra*, 512 U.S. at p. 384 [explaining that a taking would have occurred had the government simply required the permit applicant to dedicate a strip of her land for public use, rather than conditioning the grant of her application to redevelop her property on such a dedication].)

In *Koontz*, the Supreme Court rejected the government's contention that "an obligation to spend money can never provide the basis for a takings claim." (*Koontz, supra*, 570 U.S. at p. 612.) In so doing, the court initially observed that if it were to accept this argument, it would be very easy for land-use permitting officials to avoid the requirements of *Nollan* and *Dolan*, reasoning as follows: "Because the government need only provide a permit applicant with one alternative that satisfies the nexus and rough proportionality standards, a permitting authority wishing to exact an easement could simply give the owner a choice of either surrendering an easement or making a payment equal to the easement's value. Such so-called 'in lieu of' fees are utterly commonplace, [citation], and they are functionally equivalent to other types of land use exactions. For that reason and [others], we reject [the government's] argument and hold that so-called "monetary exactions" must satisfy the nexus and rough proportionality requirements of *Nollan* and *Dolan*." (*Ibid*.) The *Koontz* court went on to reject the argument that a government-imposed condition requiring a permit applicant to spend money improving public lands could not give rise to a taking, concluding that a monetary obligation that burdens a person's ownership of a specific parcel of land is subject to scrutiny under *Nollan* and *Dolan*. (*Id*. at pp. 613-614.) In reaching this conclusion, the court explained: "The fulcrum this case turns on is the direct link between the government's demand and a specific parcel of real property. Because of that direct link, this case implicates the central concern of *Nollan* and *Dolan*: the risk that the government may use its substantial power and discretion in land-use permitting to pursue governmental ends that lack an

16

essential nexus and rough proportionality to the effects of the proposed new use of the specific property at issue, thereby diminishing without justification the value of the property." (*Id.* at p. 614, fn. omitted.) The court further explained that "when the government commands the relinquishment of funds linked to a specific, identifiable property interest such as a . . . parcel of real property, a '*per se* [takings] approach' is the proper mode of analysis under the Court's precedent." (*Ibid*.)[3]

We agree with Sheetz that *Koontz* "controls" the "predicate taking question." Here, because there is a "direct link" between the County's demand that Sheetz make a

---

[3] In holding that "the government's demand for property from a land-use permit applicant must satisfy the requirements of *Nollan* and *Dolan* even when the government denies the permit and even when its demand is for money" (*Koontz, supra*, 570 U.S. at p. 619), the Supreme Court distinguished *Eastern Enterprises v. Apfel* (1998) 524 U.S. 498, a case the government relied on "for the proposition that an obligation to spend money can never provide the basis for a takings claim." (*Koontz,* at p. 612.) In *Eastern Enterprises*, a federal statute retroactively imposed on a former mining company an obligation to pay for the medical benefits of retired miners and their families. A plurality of the Supreme Court concluded that the statute's imposition of retroactive financial liability was so arbitrary that it violated the takings clause. (*Eastern Enterprises,* at pp. 529-537.) Although Justice Kennedy concurred in the result on due process grounds, he joined four other justices in dissent, concluding that the takings clause does not apply to government-imposed financial obligations that "d[o] not operate upon or alter an identified property interest." (*Id*., at p. 540 [conc. & dis. opn. of Kennedy, J.); see *id*. at pp. 554-555 [dis. opn. of Breyer, J.) [concluding that the takings clause applies only when the government appropriates a "specific interest in physical or intellectual property" or "a specific, separately identifiable fund of money"; by contrast, the clause has no bearing when the government imposes "an ordinary liability to pay money"].)

In distinguishing *Eastern Enterprises*, the *Koontz* court explained: "[The government's] argument rests on a mistaken premise. Unlike the financial obligation in *Eastern Enterprises*, the demand for money at issue here did 'operate upon . . . an identified property interest' by directing the owner of a particular piece of property to make a monetary payment. [Citation.] In this case, unlike *Eastern Enterprises*, the monetary obligation burdened petitioner's ownership of a specific parcel of land. In that sense, this case bears resemblance to our cases holding that the government must pay just compensation when it takes a lien—a right to receive money that is secured by a particular piece of property." (*Koontz, supra*, 570 U.S. at p. 613.)

17

monetary payment to improve public roadways and a specific parcel of real property (Sheetz's residential parcel), the challenged permit condition (TIM fee) is subject to the heightened scrutiny of *Nollan* and *Dolan*. The condition is a government-imposed financial obligation that burdened Sheetz's ownership of his real property. As such, it implicates the "central concern" of *Nollan* and *Dolan*, thereby requiring a " '*per se* [takings] approach.' " (See *Koontz, supra*, 570 U.S. at p. 614, see *id.* at p. 613.) In other words, the TIM fee is a monetary exaction that must satisfy the "essential nexus" and "rough proportionality" requirements of *Nollan* and *Dolan* to withstand a constitutional challenge under the takings clause. (See *Anderson Creek Partners, L.P. v. County of Harnett* (2022) 382 N.C. 1, 27-30 (*Anderson Creek*) [North Carolina Supreme Court reached the same conclusion as to water and sewer "capacity use" fees imposed as a condition for residential development].)

We arrive at this conclusion with the understanding that while *Koontz* involved an "in lieu of" fee--i.e., an impact fee instead of a dedication of real property--the majority's holding was clearly not limited to those precise fees or monetary exactions. (See *Sheetz, supra*, 601 U.S. at p. 276 [explaining that the *Nollan/Dolan* test "applies regardless of whether the [permit] condition requires the landowner to relinquish property or requires her to pay a 'monetary exactio[n]' instead of relinquishing the property"], citing *Koontz, supra*, 570 U.S. at pp. 612-615; see *California Building, supra,* 61 Cal.4th at p. 459, fn. 11 [declining to decide the issue but recognizing that *Koontz* "suggests that the *Nollan/Dolan* test applies to monetary permit conditions even when the payment is not imposed in lieu of a requirement that the property owner dedicate a property interest"]; *Ehrlich v. City of Culver City* (1996) 12 Cal.4th 854, 868, 876, 881 (*Ehrlich*) (plur. opn. of Arabian, J.) [concluding that certain impact fees (a fee imposed by an administrative agency upon a specific development project on an individual and discretionary basis) qualify as land-use regulations subject to the heightened scrutiny of *Nollan* and *Dolan*];

18

*id*. at p. 899 (conc. opn. of Mosk, J) [agreeing with the plurality on this point].)[4]

According to Sheetz, the permit condition at issue here (TIM fee) involves an extortionate demand for private property (money) made by the County in response to his application to build a single-story home on his residential parcel. Thus, under *Koontz*, the challenged fee (monetary exaction) implicates the "unconstitutional-conditions" test the Supreme Court established in *Nollan* and *Dolan*, which governs the validity of land-use conditions (e.g., impact fees) the government imposes for the approval of a building permit. (See *Koontz, supra*, 570 U.S. at p. 607 ["Extortionate demands for property in the land-use permitting context run afoul of the Takings Clause not because they take property but because they impermissibly burden the right not to have property taken without just compensation. As in other unconstitutional conditions cases in which

---

[4] The *Koontz* majority extended the scope of the takings clause in the special context of land-use exactions "to cases in which the government conditions a permit not on the transfer of real property, but instead on the payment or expenditure of money." (*Koontz, supra*, 570 U.S. at p. 620 (dis. opn. of Kagan, J.); see *id*. at pp. 629-630 [noting that the majority extended *Nollan* and *Dolan's* heightened scrutiny to *all monetary exactions* made by the government in the land-use permitting context].) As pointed out by Justice Kagan in her dissenting opinion and acknowledged by Justice Alito in his majority opinion, prior to the issuance of *Koontz*, the requirements of *Nollan* and *Dolan* applied only if the property demand made during the permitting process would have violated the takings clause independent of that proposed exchange. In other words, the heightened scrutiny of the *Nollan/Dolan* test applied only if the demand made by the government (land-use exaction) would have constituted a taking when executed outside the permitting process. (See *Koontz,* at p. 612; *id*. at pp. 622-626 (dis. opn. of Kagan, J.).) According to Justice Kagan, the majority in *Koontz* failed to explain why the government's condition for the issuance of a building permit (monetary payment for offsite mitigation work on public wetlands) was unconstitutional under the analytical framework that *Nollan* and *Dolan* established, that is, how imposition of the challenged condition directly--i.e., independent of an exchange for a government benefit--would violate the Fifth Amendment. (See *Koontz,* at p. 626, fn. 1 (dis. opn. of Kagan, J.).) In so asserting, Justice Kagan noted: "The government may (separate and apart from permitting) require a person—whether Koontz or anyone else—to pay or spend money without effecting a taking. The majority offers no theory to the contrary: It does not explain, as it must, why the [government's] condition was 'unconstitutional.' " (*Ibid*. (dis. opn. Kagan. J.).)

someone refuses to cede a constitutional right in the face of coercive pressure, the impermissible denial of a governmental benefit is a constitutionally cognizable injury"].)

B. *Nollan/Dolan Test*

Having determined that the challenged permit condition (TIM fee) is subject to the heightened scrutiny of *Nollan* and *Dolan*, we must decide whether the condition constitutes a violation of the takings clause under the special application of the "unconstitutional conditions" doctrine. Recall that, to ensure against extortionate demands against permit applicants by the government, the Supreme Court has adopted a two-part test for evaluating land-use permit conditions (i.e., exactions), which is commonly referred to as the *Nollan/Dolan* test after the two cases that established it. (*Sheetz, supra*, 601 U.S. at p. 275.) Applied here, we must decide whether there is an "essential nexus" or logical connection between the TIM fee and the County's land-use interest (reducing traffic congestion from new development), and whether there is "rough proportionality" between the magnitude of the fee ($23,420) and the projected public impacts/social costs of Sheetz's proposed development (single-family home) on the County's land-use interest. (*Id*. at pp. 275-276.) Contained within the latter inquiry is the additional question of whether a permit condition imposed on a class (i.e., type) of development (here single-family residential), must be tailored with the same degree of specificity as a permit condition that only targets a particular development project. More specifically, we must decide the question the Supreme Court explicitly declined to answer in this case: whether the takings clause prohibits the longstanding government practice of imposing permit conditions, such as impact fees, on permit applicants based on reasonable formulas or schedules that assess the impact of entire classes of development rather than the impact of specific parcels of property. (*Id*. at p. 284 (conc. opn. of Kavanaugh, J.).)

As we next explain, we conclude the TIM fee does not constitute an unlawful taking without just compensation in violation of the Fifth Amendment. Under the

20

circumstances presented, the impact fee withstands the heightened scrutiny of the *Nollan/Dolan* test.

### 1. *Essential Nexus Standard*

The "essential nexus" component of the *Nollan/Dolan* test comes from *Nollan, supra*, 483 U.S. 825. The inquiry regarding this standard is a relatively low threshold, requiring only some logical connection between a legitimate governmental interest and the permit condition demanded by the government. (*Id.* at p. 837; *Dolan, supra*, 512 U.S. at pp. 386-388; see *Ehrlich, supra*, 12 Cal.4th at p. 877 [plur. opn. of Arabian, J.) [explaining that the "vice" of the government's permit condition in *Nollan* was "the absence of any logical connection between the condition and the purported justification for an outright ban on development"].) The essential nexus requirement ensures that the government is acting to further its stated interest or regulatory purpose, not leveraging its "permitting monopoly" to exact private property without paying for it. (*Sheetz, supra*, 601 U.S. at p. 275; see *Ehrlich,* at pp. 867-868 (plur. opn. of Arabian, J.) [*Nollan* requires a permit condition to be logically related to a legitimate regulatory interest or objective, explaining that a land-use permitting authority engages in improper regulatory "leveraging" by imposing unrelated land-use exactions as a condition for granting permit approval].) For example, in *Dolan*, the Supreme Court found that the prevention of flooding and reducing traffic congestion were legitimate government interests, and that the government's permit conditions for approval of a project that would have increased the size of an existing retail business and paved a parking lot--greenway and pedestrian/bicycle pathway easements--were reasonably linked to those interests. (*Dolan, supra*, 512 U.S. at pp. 387-388.)

By contrast, in *Nollan*, the Supreme Court found that the essential nexus standard had not been met. There, the government (California Coastal Commission) demanded a lateral public easement across the landowners' beachfront lot in Ventura County in exchange for a permit to demolish an existing bungalow and replace it with a three-

21

bedroom house. (*Nollan, supra*, 483 U.S. at pp. 827-828.) The public easement was designed to connect two public beaches that were separated by the landowners' property. (*Ibid.*) The government claimed the public easement condition was imposed to, among other things, promote the legitimate public interests of "protecting the public's ability to see the beach" and "assisting the public in overcoming the 'psychological barrier' to using the beach created by a developed shorefront." (*Id.* at p. 835.) In holding that the permit condition violated the takings clause, the Supreme Court assumed (without deciding) that the government's concern with protecting visual access to the ocean constituted a legitimate public interest, and noted that a permit condition requiring the landowners to provide a viewing spot on their lot for the public with which their new house would not interfere would have been constitutional. (*Id.* at pp. 835-836.) However, the court went on to conclude that the government exceeded the scope of its regulatory authority when it claimed that a nexus existed between visual access to the ocean and a permit condition requiring lateral public access along the landowners' beachfront lot. (*Id.* at pp. 836-839.) The court found it "quite impossible to understand" how such an easement furthered "visual access" to the ocean or lowered the "psychological barrier" for people to use the beach. (*Id.* at p. 838.) In the absence of the required nexus or link between the permit condition and the government's justification for requiring it, the government was simply trying to obtain an easement through "gimmickry," which converted a valid regulation of land use into " 'an out-and-out plan of extortion' " in violation of the takings clause. (*Id.* at pp. 837, 841-842; see *Dolan, supra*, 512 U.S. at p. 387 [describing the government's actions in *Nollan* as an attempt to obtain an easement "through gimmickry"].)

Here, we have little difficulty concluding that an "essential nexus" exists between the County's legitimate interest in reducing traffic congestion from new development and the permit condition requiring Sheetz to pay a fee to mitigate or offset the traffic impacts from his proposed development project. As the Supreme Court recognized in *Dolan*,

reducing traffic congestion is a legitimate government interest in the land-use regulation context, including when (as here) the landowner seeks a permit for new development. (*Dolan, supra*, 512 U.S. at p. 387; see also *Northern Illinois Home Builders Ass'n, Inc. v. County of Du Page* (1995) 165 Ill.2d 25, 32 ["it is clear that the need to minimize or reduce traffic congestion is a legitimate State interest"].) And there is a logical connection between the County's legitimate government interest and the challenged TIM fee. Sheetz, through the permitting process, sought permission from the County to build a single-family home on his residential parcel, which would have increased the amount of traffic on public roads within the County. Sheetz does not dispute that increased population from new residential development places additional burdens on the County's public roadway system. (See *Ehrlich, supra*, 12 Cal.4th at p. 909 (conc. opn. of Kennard, J.) [observing that because the construction of 30 new townhouses would have increased the city's "housing stock and thus the number of its residents," the city "could reasonably impose a fee to offset the increased demand on public recreational facilities attributable to the increase in population resulting from the development"].) Nor does Sheetz dispute that new and improved roadway facilities would be required to maintain existing traffic levels to accommodate the increase in traffic generated by new development. (See *Home Builders Assn. of Tulare/Kings Counties, Inc. v. City of Lemoore* (2010) 185 Cal.App.4th 554, 565 (*City of Lemoore*) [explaining that because increased population due to new development would place additional burdens on the citywide community and recreation facilities, new facilities would be required to maintain a similar level of service to the population].) Accordingly, because the County has a legitimate interest (i.e., valid police-power purpose) in mitigating the traffic impacts from new development, the County could reasonably impose a fee on Sheetz to offset the projected impact on that interest from his proposed development project. Indeed, the Supreme Court has described a permit condition of this nature--a condition that insists "landowners internalize the negative externalities of their conduct"--as "a hallmark of responsible

23

land-use policy." (*Koontz, supra,* 570 U.S. at p. 605 [noting that the court has "long sustained such regulations against constitutional attack"].)

We find unpersuasive Sheetz's contention that the TIM fee "lacks" an "essential nexus" to the County's legitimate government interest in reducing traffic congestion from new development. In support of his position, Sheetz cites *Nollan* for the proposition that "unless the permit condition serves the same governmental purpose as [a] development ban, the building restriction is not a valid regulation of land use but 'an out-and-out plan of extortion.' " (*Nollan, supra*, 483 U.S. at p. 837.) He argues the TIM fee fails the nexus test because there is no essential connection or rational link between the specific public impacts (social costs) attributable to his development project and the County's actual interest in denying him a building permit outright (i.e., without the option to secure the permit by agreeing to pay the fee), since the purpose of the County's fee program "is not to mitigate a particular project's traffic impacts, but instead to provide 'additional funding mechanisms necessary to ensure that [traffic] improvements . . . are fully funded and capable of being implemented concurrently with new development.' " He claims the required nexus is absent here because the fee program is "drive[n]" by the County's desire to "exact money from a permit applicant--not the particular project's impacts." We are not persuaded.

The Supreme Court has "long recognized that land-use regulation does not effect a taking if it 'substantially advance[s] legitimate state interests' and does not 'den[y] an owner economically viable use of his land.' " (*Nollan, supra,* 483 U.S. at p. 834.) After noting that a "broad range of governmental purposes and regulations satisfies these requirements" (see *id*. at p. 845 [citing cases]), the *Nollan* court explained that "a permit condition that serves the same legitimate police-power purpose as a refusal to issue the permit should not be found to be a taking if the refusal to issue the permit would not constitute a taking." (*Id*. at p. 836; see *Ehrlich, supra*, 12 Cal.4th at p. 868 (plur. opn. of Arabian, J.) ["Where the local permit authority seeks to justify a given exaction as an

24

alternative to denying a proposed use, *Nollan* requires a reviewing court to scrutinize the instrumental efficacy of the permit condition in order to determine whether it logically furthers the *same* regulatory goal as would outright denial of a development permit"].)

By way of example, the *Nollan* court explained: "[I]f the [government had] attached to the [beachfront landowners'] permit some condition that would have protected the public's ability to see the beach notwithstanding construction of the new house—for example, a height limitation, a width restriction, or a ban on fences—so long as the [government] could have exercised its police power . . . to forbid construction of the house altogether, imposition of the condition would also be constitutional. Moreover[,] . . .  the condition would be constitutional even if it consisted of the requirement that the [landowners] provide a viewing spot on their property for passersby with whose sighting of the ocean their new house would interfere.  Although such a requirement, constituting a permanent grant of continuous access to the property, would have to be considered a taking if it were not attached to a development permit, the [government's] assumed power to forbid construction of the house in order to protect the public's view of the beach must surely include the power to condition construction upon some concession by the owner, even a concession of property rights, that serves the same end.  If a prohibition designed to accomplish that purpose would be a legitimate exercise of the police power rather than a taking, it would be strange to conclude that providing the owner an alternative to that prohibition which accomplishes the same purpose is not. [¶]  The evident constitutional propriety disappears, however, if the condition substituted for the prohibition utterly fails to further the end advanced as the justification for the prohibition." (*Nollan, supra*, 483 U.S. at pp. 836-837.)  In *Nollan*, the Supreme Court held that the essential nexus standard had not been satisfied because the government's purported justifications for the permit condition--e.g., the interference of the newly constructed house with a public view of the ocean and the "psychological barrier" the

new home created to people using the public beaches--were not served by a lateral easement allowing individuals to walk along the shoreline. (*Id*. at pp. 838-839.)

Here, the record reflects that the challenged permit condition (TIM fee) substantially advances the County's legitimate government interest in reducing traffic congestion generated by new development. The County uses the impact fee to finance improvements to its public roadway system that are necessitated by increased traffic attributable to population and job growth from new development. Sheetz, for his part, does not argue the County could not have lawfully denied his request for a building permit on the ground that his parcel would not have remained "economically viable" without the requested new development. Nor does Sheetz argue that the County's refusal to issue the requested building permit outright--that is, without the option to secure the permit by agreeing to pay the fee--would have constituted an unconstitutional taking.[5] (See *Nollan, supra*, 483 U.S. at pp. 835-836 [explaining that it was "unquestionable" the government could deny the beachfront landowners a building permit outright if their new house (alone, or by reason of the *cumulative* impact produced in conjunction with other construction) would substantially impede permissible public interests (e.g., protecting the public's ability to see the beach)].) Further, Sheetz has not offered a persuasive explanation as to how the challenged permit condition (TIM fee) "utterly fails" to serve the same governmental interest/police-power purpose as a refusal to issue him a

___

[5] As the Supreme Court has explained: "A requirement that a person obtain a permit before engaging in a certain use of his or her property does not itself 'take' the property in any sense: after all, the very existence of a permit system implies that permission may be granted, leaving the landowner free to use the property as desired. Moreover, even if the permit is denied, there may be other viable uses available to the owner. Only when a permit is denied and the effect of the denial is to prevent 'economically viable' use of the land in question can it be said that a taking has occurred." (*United States v. Riverside Bayview Homes, Inc*. (1985) 474 U.S. 121, 127.)

residential building permit. Indeed, both options undoubtedly further the County's legitimate regulatory goal of minimizing traffic congestion on public roadways.

In this case, the County sought to accommodate Sheetz's desire to build a new single-family home on the condition he pay a fee to mitigate or offset the increased traffic generated from his proposed project. Sheetz has not cited, and our independent research has not revealed, any authority supporting the conclusion that the essential nexus standard is not met under the circumstances presented. And we see no basis to conclude otherwise. It is clear to us that the required nexus exists between the County's legitimate interest/regulatory goal of minimizing traffic congestion and the TIM fee, which is imposed on all new development to finance roadway improvements to meet increased traffic needs caused by such development. This case presents a quintessential or classic instance of a government's legitimate exercise of the police power in the land-use context. (See *Dolan, supra*, 512 U.S. at p. 387 [noting that the reduction of traffic congestion from a proposed development project qualifies as the type of legitimate public interest that has been upheld].)

We reject Sheetz's suggestion that the TIM fee does not satisfy *Nollan's* "essential nexus" standard because the permit condition requires him to "solve a problem" that does not "arise" from his proposed development project. As we have discussed, Sheetz does not dispute that new residential development results in population growth. And there is evidence in the administrative record showing that population growth from residential development increases commercial development, job growth, and traffic congestion on public roadways within the County. The record further reflects that Sheetz was not singled out to bear the burden of the County's attempt to remedy the problem of increased traffic congestion spurred by new development. To the contrary, the County's TIM fee program requires *all* types of new development, including multifamily and commercial development, to pay a fee to finance roadway improvements. The record includes competent evidence demonstrating that such infrastructure improvements are

27

necessary to further the County's regulatory goal of minimizing the direct and cumulative traffic impacts on public roadways attributable to new development. We are unpersuaded by the remaining conclusory arguments Sheetz offers as to why the TIM fee lacks an essential nexus.[6]

In short, we find that the required relationship or link between the challenged permit condition (TIM fee) and the County's legitimate government interest (reducing traffic congestion) is present here. Stated differently, we conclude the *Nollan* component of the *Nollan/Dolan* test has been satisfied because there is an "essential nexus," or logical connection, between the County's regulatory goal or police-power purpose and the challenged impact fee. Accordingly, we turn to the second step of the *Nollan/Dolan* analysis.

### 2. *Rough Proportionality Standard*

The "rough proportionality" component of the *Nollan/Dolan* test comes from *Dolan, supra*, 512 U.S. 374. It requires a court to determine whether the degree of the land-use exaction demanded by the government's permit condition "bears the required relationship to the projected impact of [the landowner's] proposed development." (*Id*. at p. 388.) The inquiry regarding this standard is whether there is a "rough proportionality," both in nature (type) and extent (magnitude), between the permit condition (e.g., impact fee) and the projected public impacts (social costs) of the proposed development. (*Id*. at p. 391.) Thus, while the Supreme Court in *Nollan* was concerned with the nature of the relationship between a proposed development project and a permit condition, its focus in *Dolan* was on the *degree* of the required connection between the permit condition and the

---

[6] These remaining arguments, such as the claim that the fee program requires single-family development to pay a substantial portion of costs to mitigate traffic impacts attributable to *commercial* development, are essentially reasons why, in Sheetz's view, the fee does not satisfy *Dolan's* "rough proportionality" standard. We address this next step of the analysis *infra*.

28

projected impact of the proposed development. (See *id.* at pp. 377, 386-391, italics added.) To satisfy this standard, the permit condition (e.g., impact fee) must have "rough proportionality" to the proposed development's impact or burden on the government's land-use interest (here, reducing traffic congestion), and must not require a landowner to give up (here, pay) more than is necessary to mitigate the harm (social costs) resulting from the new development. (*Sheetz, supra*, 601 U.S. at pp. 275-276; see *Dolan, supra,* 512 U.S. at pp. 388-396; *Koontz, supra*, 570 U.S. at pp. 612-615, 619 [monetary exactions must satisfy the rough proportionality requirement of *Dolan*].)

In *Dolan*, a landowner sought to double the size of her hardware store and pave the store's parking lot. (*Dolan, supra*, 512 U.S. at p. 379.) As a condition for approval of the building permit, an Oregon municipality (city) required that the landowner dedicate a portion of her parcel for flood control and traffic improvements. (*Id*. at p. 380.) Specifically, the city directed the landowner to dedicate a percentage of her parcel adjacent to a floodplain to the city's "greenway system" to prevent additional stress on its storm drainage system. (*Id*. at pp. 379-380.) To relieve traffic congestion in the area near the landowner's business, the city also required the dedication of an additional 15-foot strip of land adjacent to the floodplain as a pedestrian/bicycle pathway. (*Id*. at p. 380.) As justification for the required real property dedications, the city made generalized findings concerning the relationship between the exactions and the projected impacts of the proposed project. With respect to the pedestrian/bicycle pathway, the city found it was " '*reasonable to assume* that customers and employees of the future uses of this site could utilize a pedestrian/bicycle pathway adjacent to this development for their transportation and recreational needs.' " (*Id*. at p. 381, italics added.) As for the flood control dedication, the city found that the " 'anticipated increased storm water flow from the subject property to an already strained creek and drainage basin *can only add* to the public need to manage the stream channel and floodplain for drainage purposes.' " (*Id*. at

29

p. 382, italics added.)  The Oregon state courts upheld the city's permit conditions, and the Supreme Court granted certiorari.  (*Id*. at p. 383.)

In reversing, the *Dolan* court extended the "essential nexus" standard established in *Nollan* by adding a "rough proportionality" requirement.  (See *Dolan, supra*, 512 U.S. at pp. 388-396.)  In so doing, the high court began its analysis by observing that state courts had been dealing with the land-use question at issue "a good deal longer" than it had and typically applied one of three standards.  (*Id.* at pp. 389-391.)  The Supreme Court rejected the "deferential" standard adopted in some states, which allowed "very generalized statements as to the necessary connection between the required [exaction] and the proposed development . . . to suffice."  (*Id*. at p. 389.)  The court found this standard "too lax" to adequately protect a person's constitutional right to just compensation if their property is taken for a public purpose.  (*Ibid*.)  The court also rejected the more stringent standard adopted in other states, which required a "very exacting correspondence" between the required exaction and the proposed development, described as the " 'specific and uniquely attributable' test."  (*Ibid*.)  Under that standard, the government must demonstrate that the mandated exaction is "directly proportional" to a burden specifically created by the development; otherwise, the "exaction becomes 'a veiled exercise of the power of eminent domain and a confiscation of private property behind the defense of police regulations.' "  (*Id*. at p. 390.)  In rejecting this standard, the Supreme Court determined that the federal constitution does not require "such exacting scrutiny, given the nature of the interests involved."  (*Ibid*.)

The third standard, an "intermediate position" adopted by a majority of the state courts requires a showing of a "reasonable relationship" between the required exaction and the public impacts of the proposed development project.  (*Dolan, supra*, 512 U.S. at pp. 390, 391 [explaining that "[d]espite any semantical differences, general agreement exists among the courts 'that the [exaction] should have some reasonable relationship to the needs created by the [development]' "].)  As a representative example of this

30

standard, the *Dolan* court cited a decision issued by the Nebraska Supreme Court, which observed that the distinction between a proper exercise of the police power and an improper exercise of eminent domain turned on whether there was "some reasonable relationship or nexus to the use to which the property is being made or is merely being used as an excuse for taking property simply because at that particular moment the landowner is asking the [government] for some license or permit." (*Id.* at p. 390.) The government may not, the Nebraska high court held, "require a property owner to dedicate private property for some future public use as a condition of obtaining a building permit when such future use is not 'occasioned by the construction sought to be permitted.' " (*Ibid.*)

As another example of the "intermediate position," the *Dolan* court cited a decision issued by the Wisconsin Supreme Court. (*Jordan v. Village of Menomonee Falls* (1965) 28 Wis.2d 608 (*Jordan*), appeal dismissed, *Jordan v. Village of Menomonee Falls* (1966) 385 U.S. 4.) In that case, which involved a taking clause challenge to an ordinance requiring "subdividers" (i.e., subdivision developers) to either dedicate a portion of their land or pay a fee in lieu thereof to ensure adequate open spaces and sites for public uses (e.g., schools, parks), the court concluded that "a required dedication of land for school, park, or recreational sites as a condition for approval of the subdivision plat should be upheld as a valid exercise of police power if the evidence reasonably establishes that the municipality will be required to provide more land for schools, parks, and playgrounds as a result of approval of the subdivision."[7] (*Id*. at p. 618; see also *id*. at

---

[7] In discussing the reasonable relationship test in the context of land-use exactions, the Wisconsin Supreme Court stated: "The basis for upholding a compulsory land-dedication requirement in a platting ordinance in the nature of the instant ordinance is this: The municipality by approval of a proposed subdivision plat enables the subdivider to profit financially by selling the subdivision lots as home-building sites and thus realizing a greater price than could have been obtained if he had sold his property as unplatted lands. In return for this benefit the municipality may require him to dedicate

pp. 613-614.)  In holding that both the real property dedication and the in lieu of fee were constitutional and a reasonable exercise of the police power, the court explained:  "The evidence reasonably supports the conclusions that:  (1) the approval of the instant and other subdivision plats during the four-year period following the enactment of the ordinance has required defendant village and the encompassing school districts to expend large sums for acquisition of park and school lands and construction of additional school facilities; (2) these expenditures were made necessary by the influx of people into these subdivisions; and (3) these expenditures are greater than the amount which has been exacted from the subdividers by way of land-dedication and equalization fees paid in lieu of land dedication."  (*Id*. at pp. 620-621.)  In rejecting the more restrictive "specifically and uniquely attributable" test applied in other jurisdictions, the court stated:  "In most instances it would be impossible for the municipality to prove that the land required to be dedicated for a park or a school site was to meet a need solely attributable to the anticipated influx of people into the community to occupy this particular subdivision.  On the other hand, the municipality might well be able to establish that a group of subdivisions approved over a period of several years had been responsible for bringing into the community a considerable number of people making it necessary that the land dedications required of the subdividers be utilized for school, park and recreational purposes for the benefit of such influx.  In the absence of contravening evidence this would establish a reasonable basis for finding that the need for the acquisition was occasioned by the activity of the subdivider."  (*Id*. at pp. 617-618; see *Collis v. City of Bloomington* (1976) 310 Minn. 5, 12-13, 18 [Minnesota Supreme Court following the approach of the high courts in Wisconsin, California, and New York, which require "a

---

part of his platted land to meet a demand to which the municipality would not have been put but for the influx of people into the community to occupy the subdivision lots." (*Jordan v. Village of Menomonee Falls, supra*, 28 Wis.2d at pp. 619-620.)

reasonable relationship" between the permit condition (exaction) and the government's need for the property demanded as a condition of project approval (*id*. at p. 14].)

In endorsing the intermediate standard of judicial scrutiny, the *Dolan* court declined to adopt the "reasonable relationship" moniker (see *Dolan, supra*, 512 U.S. at p. 391), and instead concluded that the term " 'rough proportionality' best encapsulates . . . the requirement of the Fifth Amendment," explaining that such a formulation entails "*some sort of individualized determination* that the required [exaction] is related both in nature and extent to the impact of the proposed development." (*Ibid*., italics added.) Although no "precise mathematical calculation is required" (*ibid*.), the government must nevertheless "make *some effort to quantify its findings* in support of the [exaction]" beyond mere conclusory statements that it will mitigate or offset some anticipated public impacts created by the project (*id*. at pp. 395-396, italics added).

Applying the newly established rough proportionality standard, the *Dolan* court found that the city's required real property dedications to its greenway system and pedestrian/bicycle pathway were not "reasonably related" to the landowner's proposed development project, which (as noted *ante*) involved increasing the size of her retail store and paving the store's parking lot. (See *Dolan, supra,* 512 U.S. at pp. 392-396.) While the Supreme Court acknowledged that keeping portions of the floodplain adjacent to the landowner's property free of development could logically mitigate pressures on the city's sewage system, the court observed that "the city demanded more—it not only wanted [the landowner] not to build in the floodplain, but it also wanted [her] property along [the] Creek for its greenway system." (*Id*. at p. 393.) However, the city never explained "why a public greenway, as opposed to a private one, was required in the interest of flood control." (*Ibid*.) The court thus found it "difficult to see" how public access to the landowner's floodplain easement was "sufficiently related to the city's legitimate interest in reducing flooding problems along [the] Creek." (*Ibid*.) And the court noted that the city had not attempted to make any individualized determination to support this part of its

33

request.  (*Ibid*.)  As a result, the court held, "the findings upon which the city relies do not show the required reasonable relationship between the floodplain easement and the [landowner's] proposed new building."  (*Id*. at pp. 394-395.)

As for the pedestrian/bicycle pathway, the Supreme Court stated that it had "no doubt" the landowner's proposed development would increase traffic in the area near the project.  (*Dolan, supra*, 512 U.S. at p. 395.)  Nevertheless, the court concluded the city had not demonstrated that the additional vehicle and bicycle trips generated by the project "reasonably related" to the city's requirement for the pedestrian/bicycle pathway easement.  (*Ibid*.)  The city, the high court said, had "simply found that the creation of the pathway '*could* offset some of the traffic demand . . . and lessen the increase in traffic congestion.' "  (*Ibid*., italics added.)  The fact that the pathway "*could*" have had such an effect was insufficient to demonstrate the constitutionally required relationship between the development and the required dedication of property.  In so finding, the court explained that the potential of the bicycle system to " ' "offset some of the traffic demand" is a far cry from a finding that the . . . system *will,* or is *likely to*, [do so].' " (*Ibid*.)  The *Dolan* court held that "the city must make some effort to quantify its findings in support of the dedication for the pedestrian/bicycle pathway beyond the conclusory statement that it could offset some of the traffic demand generated."  (*Id*. at pp. 395-396.)  Concluding that "the findings upon which the city relies do not show the required reasonable relationship," the court ordered the case remanded for further proceedings. (*Id*. at pp. 394-395.)

Over the ensuing three decades since *Dolan* was decided in the early 1990s, the Supreme Court has not provided further guidance as to the contours of the *Dolan* standard aside from noting that the rough proportionality requirement has not been extended "beyond the special context of exactions—land-use decisions conditioning approval of development on the dedication of property to public."  (*City of Monterey v. Del Monte Dunes at Monterey, Ltd*., *supra*, 526 U.S. at p. 702.)  As a result, the law in

this area, as it did prior to *Nollan* and *Dolan*, has largely developed in the state courts. (See *Sheetz, supra*, 601 U.S. at p. 273, fn. 3 [collecting state court cases issued after *Dolan*]; *Koontz, supra*, 570 U.S. at p. 618 [citing state court cases and noting that "courts in many of our Nation's most populous States . . . have confronted constitutional challenges to monetary exactions over the last two decades and applied the standard from *Nollan* and *Dolan* or something like it"]; *Dolan, supra*, 512 U.S. at pp. 389, 390 [recognizing that state courts had been "dealing with" the validity of land-use exactions "a good deal longer than [the Supreme Court had]"]); *Anderson Creek, supra*, 382 N.C. at pp. 20-24 [North Carolina Supreme Court discussing cases decided after *Dolan*, including cases from California].)  As the law developed without high court guidance, so did conflicts between the states' various approaches to the *Dolan* standard.

As we have outlined, *ante*, three decades after *Dolan* was decided, the Supreme Court resolved the conflict between the states' various approaches in *Sheetz, supra*, 601 U.S. 267, holding that the takings clause does not distinguish between legislative and administrative land-use permit conditions (exactions).  (*Sheetz, supra*, 601 U.S. at p. 271.)  Thus, *all* exactions in the land-use permitting context, whether they are imposed on an individualized basis through administrative action or on a generally applicable basis through legislative action, are now subject to the two-step *Nollan/Dolan* test, which is a type of "intermediate" judicial scrutiny that asks at the second step whether the required private property dedication (e.g., easement, impact fee) is related both in nature and extent to the public impacts (social costs) of the proposed development.  As applied here, this requires the County to show that the challenged permit condition (TIM fee) is roughly proportional to the projected impacts of Sheetz's proposed development project on traffic congestion.  (See *Dolan, supra*, 512 U.S. at pp. 390-391; *Koontz, supra*, 570 U.S. at 612-615; *Sheetz, supra*, 601 U.S. at pp. 275-276, 279.)  In determining whether the County has done so, we must initially decide "whether a permit condition imposed on a class of properties must be tailored with the same degree of specificity as a

35

permit condition that targets a particular development." (*Sheetz*, at p. 280.) We conclude that the answer to this question is "yes."

Having carefully reviewed the relevant Supreme Court authority, we agree with Justice Gorsuch that the *Nollan/Dolan* test does not "operate[] differently" when a land-use exaction affects (as here) a class of properties rather than a particular development. (*Sheetz, supra*, 601 U.S. at p. 282 (conc. opn. of Gorsuch, J.).) Nothing in the landmark decisions of *Nollan* and *Dolan* (or any other opinion issued by the Supreme Court thereafter) hold or suggest otherwise. In other words, we conclude the same constitutional rules apply whenever the government seeks to offset the public costs of new development through land-use exactions, regardless of whether the exaction (e.g., impact fee) is generally applicable to a class of permit applicants (as here) or is imposed on an individual basis in connection with a specific development project.

However, a finding that the same constitutional rules apply to the different analyses is not determinative of whether the impact fee challenged here effects an unlawful taking.

As noted by Justice Kavanaugh in his concurring opinion in *Sheetz*, no prior decision of the Supreme Court has addressed, let alone prohibited, the common government practice employed by the County here; namely, the imposition of permit conditions, such as impact fees, on new developments through reasonable formulas or schedules that assess the impact of classes of development rather than the impact of specific parcels of property. (*Sheetz, supra*, 601 U.S. at p. 284 (conc. opn. of Kavanaugh, J.).) And nothing inherent in the standards articulated in *Nollan* and *Dolan* precludes the government from making the required showing in this manner. In the context of a generally applicable impact fee imposed by a legislative body on specific types of new development (e.g., single-family residential, commercial) through formulas or schedules (as here), the *Dolan* standard logically requires a reviewing court to determine whether the amount of the fee is sufficiently tailored--i.e., roughly proportional (or proportionally

36

related) in nature and extent--to the overall impact the specific type of development has on the government's land-use interest.[8] (See *Puce v. City of Burnsville* (2023) 997 N.W.2d 49, 59-60 [concluding that the government (in Minnesota) could satisfy the *Dolan* standard by using percentage-based formulas to impose a park dedication fee on a particular type of property (commercial development) rather than determining the fee amount on a case-by-case basis].) The remaining question, then, is whether the challenged impact fee survives scrutiny under *Dolan's* "rough proportionality" standard.

As noted *ante*, although the *Dolan* court declined to explicitly endorse the reasonable relationship test adopted by the majority of states as of 1994, it found that the test (intermediate judicial scrutiny) was "closer to the federal constitutional norm" than the other tests employed by the state courts (*Dolan, supra*, 512 U.S. at p.391), including the less exacting standard akin to rational basis review and the more exacting standard requiring a land-use exaction to be "directly proportional to the specifically created need" (*id*. at p. 390). Thus, it appears that the *Dolan* court essentially adopted a version of the reasonable relationship test, as the "rough proportionality" standard established in that case does not mandate a "precise mathematical calculation," but instead requires the

_____

[8] Sheetz, for his part, appears to agree with our conclusion. On remand, Sheetz argues, for the first time, that "a fee based on classes of development can survive *Nollan/Dolan* review if . . . the government establishes (1) the proposed project's impacts on the public facility at issue is roughly within the range of impacts ascribed to the class to which the project belongs; and (2) the imposed fee mitigates the identified impacts--and not . . . impacts attributable to other class of development or other sources." He agrees that *Nollan/Dolan* does not require a "precise mathematical calculation" or "perfect correlation" between the fee imposed and the projected impacts of the proposed development project.

We recognize that Sheetz's supplemental brief (as we discuss *post*), also includes a contradictory argument; namely, that the challenged impact fee violates the taking clause because it was imposed without regard to the costs specifically attributable to *his particular project*.

government to make "*some sort of individualized determination*," including "*some effort to quantify its findings*," showing that the required land-use exaction is "related both in nature and extent to the impact of the proposed development." (*Id.* at pp. 391, 395-396, italics added [the land-use exaction " 'should have some reasonable relationship to the needs created by the [development]' "]; see *id.* at pp. 394-395 [concluding that a recreational floodplain easement violated the takings clause because the findings upon which the city relied to justify the exaction did not show the required reasonable relationship between the easement and the landowner's proposed new development].)

As we understand it, the *Nollan/Dolan* test is similar to the reasonable relationship standard employed in California to assess the validity of land-use exactions (e.g., impact fees) in the context of individualized (i.e., project-specific) conditions imposed on an ad hoc basis thorough administrative action. (*San Remo, supra*, 27 Cal.4th at p. 668 ["individualized development fees warrant a type of review akin to the conditional conveyances at issue in *Nollan* and *Dolan*"]; see *Ehrlich, supra*, 12 Cal.4th at p. 865 (plur. opn. of Arabian, J.) [describing California law as requiring the government to determine how there is a reasonable relationship between: (1) " 'the proposed use of a given exaction and both 'the type of development project' and 'the need for the public facility and the type of development project on which the fee is imposed' "; and (2) " 'the amount of the fee and the cost of the public facility or portion of the public facility attributable to the development on which the fee is imposed' "][9]; *City of Lemoore*, *supra*,

---

[9] California law defines a development fee as "a monetary exaction other than a tax or special assessment . . . that is charged by a local agency to the applicant in connection with approval of a development project for the purpose of defraying all or a portion of the cost of public facilities related to the development project . . . ." (§ 66000, subd. (b).) "A [development] fee shall not include the costs attributable to existing deficiencies in public facilities, but may include the costs attributable to the increased demand for public facilities reasonably related to the development project in order to (1) refurbish existing facilities to maintain the existing level of service or (2) achieve an adopted level of

38

185 Cal.App.4th at p. 561 [local governments in California have the burden to demonstrate that they used a valid method for imposing the fee in question, one that established a reasonable relationship between the fee charged and the burden posed by the development].)

The California Supreme Court reached the same conclusion nearly three decades ago in *Ehrlich*. (See *Ehrlich, supra*, 12 Cal.4th at pp. 859-860, 865-868 (plur. opn. of Arabian, J.) [equating California's reasonable relationship test with *Nollan/Dolan* scrutiny].) Thus, under the reasonable relationship test employed in California, the question at the second step of the analysis (i.e., the *Dolan* standard) is whether the amount of the challenged impact fee is reasonably related (or in *Dolan's* terms--roughly proportional) to the cost of the public facility or portion of the public facility attributable to the development on which the impact fee is imposed.

As previously indicated, with respect to the *Dolan* component of the test, the question is "whether the factual findings made by the permitting body support the condition as one that is more or less proportional, in both nature and scope, to the public impact of the proposed development." (*Ehrlich, supra*, 12 Cal.4th at p. 868 (plur. opn. of Arabian J.).) In answering that question, we are mindful the County has the burden of demonstrating the required degree of connection--"rough proportionality"--between the challenged land-use exaction and burden or projected social costs/public impacts of Sheetz's proposed project. (*Dolan, supra*, 512 U.S. at pp. 390-391; *Ehrlich, supra*, 12 Cal.4th at pp. 882-883 (plur. opn. of Arabian, J.).) We turn to that issue next.

In *Koontz*, the majority disagreed with the dissent's "forecast" that its holding--the heightened scrutiny of *Nollan* and *Dolan* applies even when the government denies a development permit and even when its demand is for money rather than real property--

_____

service that is consistent with the general plan." (§ 66001, subd. (g).) " 'Public facilities' includes public improvements, public services, and community amenities." (§ 66000, subd. (d).)

would "work a revolution" in land use law by depriving local governments of the ability to impose reasonable development impact fees. (*Koontz, supra*, 570 U.S. at pp. 618, 619.) In doing so, the majority explained: "Numerous courts—including courts in many of our Nation's most populous States—have confronted constitutional challenges to monetary exactions over the last two decades and applied the standard from *Nollan* and *Dolan* or something like it. [Citations.] Yet the 'significant practical harm' the dissent predicts has not come to pass [(e.g., how to determine whether a simple demand to pay money is a tax or impermissible land-use exaction)]. [Citation.] That is hardly surprising, for the dissent is correct that state law normally provides an independent check on excessive land use permitting fees." (*Koontz*, at p. 618; see *id*. at p. 627 [dis. opn. of Kagan, J).) As representative examples, the majority in *Koontz* cited three state court cases, including an opinion issued by the Ohio Supreme Court--*Home Builders Assn v. Beavercreek* (2000) 89 Ohio St.3d 121 (*Beavercreek*). (*Koontz*, at p. 618.)

Like here, *Beavercreek* involved an impact fee imposed on classes of new development (e.g., residential, commercial) to fund roadway improvements to offset the increased traffic generated from such development. (*Beavercreek, supra,* 89 Ohio St.3d at pp. 121-122.) In resolving the takings clause challenge, the Ohio Supreme Court used a "dual rational nexus test"[10] based on *Nollan* and *Dolan*, which "applies a middle level of scrutiny that balances the prospective needs of the community against the property rights of the developer," giving local governments "the ability to reasonably address problems that are not subject to precise measurement without being subject to unduly

---

[10] In some states, the reasonable relationship test is referred to as the "rational nexus test" or "dual rational nexus test." (See, e.g., *Anderson Creek, supra*, 382 N.C. at p. 16[North Carolina]; *Beavercreek, supra*, 89 Ohio St.3d at p. 128 [Ohio]; *F & W Associates v. County of Somerset* (1994) 276 N.J. Super. 519, 528-529 [New Jersey]; *St. Johns County v. Northeast Florida Builders Ass'n, Inc.* (1991) 583 So.2d 635, 637 [Florida]; *Simpson v. City of North Platte* (1980) 206 Neb. 240, 245 [Nebraska].)

strict review." (*Beavercreek*, at p. 128.)  Under that test, a court must determine:  (1) whether there is a reasonable connection (i.e., relationship) between the need for additional capital facilities and the growth in population generated by the subdivision; and (2) if a reasonable connection/relationship exists, whether there is a reasonable connection/relationship between the expenditure of the funds collected through the imposition of an impact fee, and the benefits accruing to the subdivision.  (*Id*. at pp. 126, 128.)  As explained by the Ohio Supreme Court:  "The dual rational nexus test places the burden on the [government].  In determining the constitutionality of [the challenged impact fee], therefore, the [government] must first demonstrate that there is a reasonable relationship between the [government's] interest in constructing new roadways and the increase in traffic generated by new developments.  [Citation.]  If a reasonable relationship exists, it must then be demonstrated that there is a reasonable relationship between the impact fee imposed by [the government] and the benefits accruing to the developer from the construction of new roadways."  (*Id*. at p. 128.)  To prove that a reasonable relationship exists in the context of a traffic impact fee, the government "must demonstrate that the methodology used to determine the need for roadway improvements funded by the impact fee is based on generally accepted traffic engineering practices." (*Id*. at pp. 128-129.)  In Ohio, the "role of a court in reviewing the constitutionality of an impact fee ordinance is not to decide which methodology provides the best results.  Given that impact fee ordinances are not subject to precise mathematical formulation, choosing the best methodology is a difficult task that the legislature, not the courts, is better able to accomplish.  Rather, a court must only determine whether the methodology used is reasonable based on the evidence presented."  (*Id*. at p. 129.)

California follows a similar procedural or program-level approach to assessing the validity of generally applicable impact fees imposed by a legislative body on classes of

new development.[11]  Under current California law, a local government has "the initial burden of producing evidence sufficient to demonstrate that it used a valid method for imposing the fee in question, one that established a reasonable relationship between the fee charged and the burden posed by the development."  (*City of Lemoore, supra*, 185 Cal.App.4th at p. 562; *Boatworks, LLC v. City of Alameda* (2019) 35 Cal.App.5th 290, 298 (*Boatworks*); see *Ehrlich, supra*, 12 Cal.4th at pp. 860, 881-883 (plur. opn. of Arabian, J.) [the government has the burden to produce evidence showing that the requirements of *Nollan* and *Dolan* have been satisfied.)  "However, the figures upon which the [government] relies will necessarily involve predictions regarding population trends and future building costs, and they need not be exact.  [Citation.]  'As a practical matter it will not always be possible to fashion a precise accounting allocating the costs,

---

**11**  We recognize that, in the context of development impact fees, Ohio's reasonable relationship test asks at the second step of the analysis whether there is a reasonable relationship between the impact fee and the *benefits* accruing to the developer from the use of the fee.  (*Beavercreek, supra,* 89 Ohio St.3d at p. 128.)  By contrast, in California, the question at the second step of the reasonable relationship analysis is whether "there is a reasonable relationship between the amount of the fee and the cost of the public facility or portion of the public facility attributable to the development on which the fee is imposed."  (§ 66001, subd. (b); see also *Ehrlich, supra*, 12 Cal.4th at p. 865 (plur. opn. of Arabian J.); see *id*. at p. 860 [at the second step of the analysis, the "reasonable relationship" standard requires "a 'rough proportionality' between the magnitude of the fiscal exaction and the effects of the proposed development"].)  In our view, the California standard is closer to the "rough proportionality" requirement adopted by the Supreme Court in *Dolan*.  (See *Dolan, supra*, 512 U.S. at p. 388 [the second part of the analysis asks whether the degree of the exaction demanded by the government's permit condition "bears the required relationship to *the projected impact of [the] proposed development*"]; *Koontz, supra*, 570 U.S. at pp. 605-606 [explaining that under the *Dolan* standard, the government may condition approval of a building permit on the dedication of property to the public so long as there is a "rough proportionality" between the property demanded and the *social costs* (i.e., public impacts) of the landowner's proposal]; *Sheetz, supra*, 601 U.S. at pp. 275-276 [explaining that permit conditions must have " ' "rough proportionality" ' " to the development's impact on the [government's] land-use interest"].)

42

and consequent benefits, of particular building projects to particular portions of the population.  All that is required of the [government] is that it demonstrate that development contributes to the need for the facilities, and that its choices as to what will adequately accommodate the [new population] are reasonably based.' " (*Boatworks, supra*, 35 Cal.App.5th at p. 298.)  In determining whether there was a valid method for imposing the fee in question, courts do not "concern themselves with the [government's] methods of marshalling and evaluating scientific data.  [Citations.]  Yet the court must be able to assure itself that before imposing the fee the [government] engaged in a reasoned analysis designed to establish the requisite connection between the amount of the fee imposed and the burden created." (*Cresta Bella, LP v. Poway Unified School Dist.* (2013) 218 Cal.App.4th 438, 447.)

"If the [government] does not produce evidence sufficient to avoid a ruling against it on the validity of the fee, the plaintiff challenging the fee will prevail.  However, if the [government's] evidence is sufficient, the plaintiff must establish a requisite degree of belief in the mind of the trier of fact or the court that the fee is invalid, e.g., that the fee's use and the need for the public facility are not reasonably related to the development project on which the fee is imposed or the amount of the fee bears no reasonable relationship to the cost of the public facility attributable to the development." (*City of Lemoore, supra*, 185 Cal.App.4th at p. 562 ["a plaintiff challenging an impact fee has to show that the record before the [government] clearly did not support the underlying determinations regarding the reasonableness of the relationship between the fee and the development"]; see also *Boatworks, supra*, 35 Cal.App.5th at p. 298.)

Although the *Dolan* court did not expressly endorse any particular version of the reasonable relationship test adopted by many states as of 1994, the principles that undergird those respective tests clearly and closely resemble the *Nollan/Dolan* test, including the "rough proportionality" requirement established in *Dolan*.  (See *Anderson Creek, supra*, 382 N.C. at pp. 16-17 [concluding that North Carolina's "rational nexus"

test "closely resembles" the "essential nexus" and "rough proportionality" requirements of *Nollan/Dolan*].)  Applying the relevant principles here, we conclude the administrative record includes sufficient evidence establishing that the challenged permit condition (TIM fee) satisfies the *Dolan* standard.  (See *F.P. Dev., LLC v. Charter Twp. of Canton* (6th Cir. 2021) 16 F.4th 198, 207 [collecting state court cases the Supreme Court cited positively in *Koontz* and noting that "the government generally satisfies the nexus and rough proportionality test with ease by introducing some evidence relating to the 'methodology and functioning' of its exactions"].)  Here, as we explained in our prior opinion, the administrative record discloses as follows:

"[T]he County's adoption of the 2004 General Plan was guided by policies that limit traffic congestion, including policies that ensure that roadway improvements are developed concurrently with new development and paid for by that development and not taxpayer funds.  In September 2005, the County adopted the interim 2004 General Plan traffic impact mitigation fee program (i.e., the TIM fee program), which implemented the transportation and circulation policies of the general plan and set forth the fee rates (that must be updated annually) imposed at the building permit stage to mitigate the effects of each type of new development (e.g., single-family residence) in the County's eight geographical fee zones.[12]  The interim program was adopted after the County considered the information contained in a technical report prepared by the DOT and

---

[12] "The TIM fee program was adopted to implement measure TC-B of the 2004 General Plan, which requires the County to adopt impact fees to mitigate roadway impacts from new development.  That policy states, in part, that the 'traffic fees should be designed to achieve the adopted level of service standards and preserve the integrity of the circulation system.'  As part of the process to implement the General Plan, the County's Department of Transportation (DOT) led several interrelated studies to determine traffic projections, specific roadway improvement needs and projected costs, existing funding and funding sources, and a proposed TIM fee rate specific to eight fee zones and various types of new development."

studies analyzing the impacts of contemplated future development on existing public roadways and the need for new and improved roads as a result of the new development.

"In August 2006, the County amended the general plan to permanently adopt the TIM fee program with adjusted new fee rates. This amendment occurred following the DOT's preparation of a detailed memorandum explaining the purpose of the fee, the use to which the fee was to be put, and the methodology used to calculate the fee rate for each type of new development. The memorandum indicated that the fee rates were developed after consideration of a variety of factors, including the expected increase in traffic volumes (average daily vehicle trips) from each type of new development. To estimate the vehicle trips or trip generation rates attributable to new development projects, the County relied on data published in the Institute of Transportation Engineers Trip Generation Manual, 7th Edition.[13] Prior to the adoption of new fee rates in 2012, including the fee rate at issue here, the DOT explained the methodology it used to adjust the rates." (*Sheetz v. County of El Dorado, supra*, 84 Cal.App.5th at pp. 416-417.)

Applying the heightened scrutiny of *Dolan's* "rough proportionality" standard, we conclude the County met its initial burden to demonstrate that it used a valid method for imposing the TIM fee, one that established a reasonable relationship between the fee charged and the projected burdens (i.e., social costs or public impacts) of Sheetz's development of a single-family home in geographic Zone 6.

---

[13] "In amending the 2004 General Plan to permanently adopt the TIM fee program, the County concluded that '[t]he facts and evidence presented in the reports, analyses, and a public hearing . . . establish that there is a reasonable relationship between the need for the described public facilities and the impacts of the types of development described, for which the corresponding fee is charged.' The County also concluded that '[t]he facts and evidence presented in the reports, analyses, and a public hearing . . . establish that there is a reasonable relationship between the fee's use and the type of development for which the fee is charged.' "

In establishing the fee schedules for each class (i.e., type) of new development in a particular geographic zone, the County identified the existing level of traffic flow on public roadway segments, assessed the degree to which projected population and employment growth from new development would impact that flow of traffic on those roadway segments over a 20-year period, and estimated the resources needed to complete infrastructure projects that would accommodate the new traffic patterns from new development to ensure compliance with the traffic flow standards set forth in the General Plan. The amount of the fee imposed on a specific type of development was based on a travel demand forecasting model, which determined the traffic contribution (vehicle trips) from each type of new development in a particular geographical zone as to each roadway segment that was projected to have a traffic flow that did not meet the standards established in the General Plan. The administrative record reflects that the County considered the relevant factors and demonstrated a rational connection between those factors and the TIM fee. The record contains detailed analyses in the form of expert technical reports (e.g., traffic studies) quantifying the traffic impacts from each type of new development in the County's eight geographical zones. In other words, the record establishes a factually sustainable proportionality between the effects of new development on traffic congestion and the amount of the challenged impact fee. We further conclude Sheetz has failed to show that the record does not support the County's determinations regarding the reasonableness of the relationship between the magnitude of the TIM fee and the public impacts of his development project. The limited portions of the record relied upon by Sheetz in the trial court and on appeal did not demonstrate that the fee constituted an unconstitutional taking in violation of the Fifth Amendment. Sheetz failed to establish that the fee is invalid because the amount ($23,420) bears no reasonable relationship to the cost of the public facility or portion of the public facility attributable to his development project.

On remand from the Supreme Court, Sheetz makes a number of new arguments that we deem forfeited. (*Cabatit v. Sunnova Energy Corporation* (2020) 60 Cal.App.5th 317, 322 ["If a party fails to raise an issue or theory in the trial court, we may deem consideration of that issue or theory forfeited on appeal"]; *Dietz v. Meisenheimer & Herron* (2009) 177 Cal.App.4th 771, 798 [party forfeited claims "by failing to demonstrate either that it preserved these arguments in the trial court, or that it may properly raise such arguments for the first time on appeal"].) Forfeiture aside, we are unpersuaded by Sheetz's belated arguments. Before turning to the merits of those arguments, however, we briefly pause to address the principal contention Sheetz advanced in the trial court (which he reiterated on appeal and now on remand from the Supreme Court); namely, that the heightened scrutiny of *Nollan/Dolan* required the County to make an *individualized* or "project-specific" determination that the required TIM fee was necessary to offset traffic congestion attributable to his *specific* development. We reject this argument because it implicitly advocates for the application of a test that is closer to the "specific and uniquely attributable test" rejected by the *Dolan* court, which requires "the local government [to] demonstrate that its exaction is directly proportional to the specifically created need." (*Dolan*, *supra*, 512 U.S. at p. 390.) Had the Supreme Court intended to adopt the standard suggested by Sheetz, it easily could have done so in *Dolan*. Instead, as we have explained, the *Dolan* court specifically endorsed a test "closer" to the "reasonable relationship" test adopted by the majority of state courts as of 1994, including California. (See *id*. at p. 391.) The standard articulated in *Dolan*--rough proportionality--does not require the more exacting scrutiny Sheetz urges us to apply here. And Sheetz fails to cite any authority persuading us to hold otherwise.

We likewise reject the other more nuanced arguments Sheetz offers for the first time on remand from the Supreme Court. In his supplemental opening brief, Sheetz primarily contends the TIM fee does not survive scrutiny under the *Dolan* standard

because the amount of the fee ($23,420) is not "proportional" to the traffic impacts attributable to the development of single-family home in his geographical zone. This is so, Sheetz claims, because the County's fee program "shift[ed] substantial costs attributable to other property uses onto new single-family residential development and otherwise required single-family development to pay a substantially higher proportion of traffic improvement costs than other classes of development" (e.g., multifamily residential development (e.g., apartments), commercial development). As an example, Sheetz asserts the County improperly "shift[ed]" at least 84 percent of the traffic impact costs attributable to commercial development "onto residential development." According to Sheetz, the TIM fee "fails the proportionality test" because the record shows that the County's fee program "was not designed to collect money in an amount commensurate with a project's traffic impacts." Instead, Sheetz argues, the "actual purpose" of the fee program "is to raise funds needed to pay the total unfunded cost of road improvement projects identified as far back as 2005, without regard to a particular project's impacts." Thus, in Sheetz's view, the TIM fee violates the takings clause because it impermissibly reallocates public burdens (the need to finance roadway improvements to offset increased traffic congestion from new development) to make single-family residential development "bear more than its fair share of the traffic improvement costs" as compared to other types of development (e.g., commercial development).

As an initial matter, we note that Sheetz's argument is predicated on a misunderstanding (or mischaracterization) of how the TIM fee program operates. Contrary to Sheetz's contention, the fee program does not "shift" 84 percent of the traffic mitigation costs attributable to new commercial development onto new residential development. Rather, the fee program requires that *all* new residential development-- single-family *and* multifamily development--*collectively* pay for 84 percent of the *total costs* of the program, with nonresidential (e.g., commercial) development responsible for the remaining 16 percent of the costs. In making this determination, the County relied on

expert analysis in technical reports (including traffic studies), which found that an increase in residential housing would result in population growth and the need for new jobs and services, thereby making new residential development responsible for a large share of the increased traffic from new development, including a substantial portion of the traffic impacts attributable to new nonresidential (e.g., commercial) development.[14] The County also relied on expert analysis in technical reports (e.g., traffic modeling analysis) to develop traffic flow projections based on population growth from anticipated residential development over a 20-year period consistent with the County's General Plan, and to identify specific roadway improvement needs from the forecasted population growth that would provide the infrastructure necessary to achieve compliance with traffic

---

[14] Trip generation is part of the process used for forecasting travel demands. It predicts the number of vehicle trips to and from particular land uses (e.g., residential, commercial). As noted, the County measured traffic impacts from new development by determining how many vehicle trips that each type of new development (e.g., single-family residential, commercial) was expected to generate.

A technical report prepared by the DOT found that, based on trip generation rates, approximately 60 percent of the total project costs for the TIM fee program were directly attributable to trips to and from residential land uses with the remaining 40 percent attributable to trips to and from nonresidential (e.g., commercial) land uses. The report, however, determined that a substantial portion (65 percent) of the anticipated new nonresidential land uses (e.g., grocery store) would be directly attributable to new residential population growth. As a result, the report recommended that the County "reallocate" a portion of traffic mitigation costs to residential development, resulting in a cost distribution with 84 percent of the total costs of the fee program being allocated to new residential development and 16 percent to new nonresidential development. In support of this allocation, the report explained that market-based studies determined that there was "limited tolerance" of nonresidential development to "absorb increased fees," and that without new nonresidential development to serve residential growth (retail and service needs), "the new residential uses would cause significantly more traffic on the roads" within the County. The report further explained that, upon "further review," it was determined that "well over half" of the remaining 35 percent of anticipated new nonresidential land uses were also directly attributable to projected residential growth. The report recommended that the County use the original 84/16 split rather than a 94/6 split.

49

level of service (LOS) standards (i.e., acceptable quality of traffic flow to preserve the integrity of the circulation system) set forth in the General Plan.[15] Cost estimates were prepared for the roadway improvements deemed necessary to address future traffic congestion spurred by population and employment growth from new development, and certain nondevelopment fee revenues (e.g., previously collected TIM fees, federal and state grant funds) were used to reduce the costs of infrastructure projects eligible for such funds.  In allocating the traffic mitigation costs attributable to each type of new development (e.g., single-family residential), the County relied on technical reports, which considered the different land use characteristics of each geographical zone and the percentage of new traffic growth attributable to each respective zone for each type of new development.  The record reflects that the TIM fee imposed for a new development project within a particular zone (e.g., single-family residential in Zone 6) was based on expert estimations as to the percentage of vehicle trips from that zone that resulted in use of roadway segments in need of improvements to accommodate traffic increases from population and employment growth.  "For example, if a certain roadway improvement project costs $12 million and development in Zone 5 contributes 10% of the traffic using the road where that project is located, then development in Zone 5 is responsible for 10%, or $1.2 million, of the project costs."  To calculate the applicable TIM fee rate for each type of new development (e.g., single-family residential), the County divided the "total costs" of all traffic improvement projects for each geographical zone by the "projected growth" of each type of development and the "applicable trip generation rates" for each

---

[15]  The goal of the TIM fee program is to ensure that increased traffic generated by new development does not exceed available roadway capacity.  To determine the necessary roadway improvements, the County relied on expert analysis in technical reports that analyzed traffic impacts using the LOS method, which measures traffic operating conditions using with a grade of A to F.  LOS A is free flowing traffic and LOS F is congested, "stop and go" traffic.

type of development. The resulting fee rates were set forth in a series of class-based fee schedules for each type of new development in the eight geographical zones, which are automatically imposed based on the type of the proposed new development. Sheetz, for his part, has not persuaded us that the TIM fee does survive scrutiny under the *Dolan* standard. He has not shown that the County violated the takings clause by improperly allocating the traffic mitigation costs attributable to new development, such that there is no "rough proportionality" between the challenged impact fee and the projected burden (social costs) of his proposed development project.

Equally without merit is Sheetz's related contention that the TIM fee program does not satisfy the *Dolan* standard because "the fee applicable to multifamily residential development is a fraction of the fee that [he] paid" to secure a permit to build a single-family home. According to Sheetz, it "makes no sense" that the required fee for a single-family home is significantly higher than the fee imposed on multifamily residential development. In support of his position, Sheetz notes that, at the time he applied for a building permit, the TIM fee required for the development of a single-family home in Zone 6 was $23,420, whereas the TIM fee for a multifamily residential development in the same zone was $15,240. But the administrative record does not support Sheetz's contention that the TIM fee for multifamily residential development was imposed "regardless of how many units are proposed by a multifamily project." Rather, the record reflects that *each* unit of a multifamily residential development is subject to the TIM fee. Thus, at the time Sheetz applied for a building permit, the total TIM fee for a proposed new multifamily residential project in Zone 6 with 15 units would have been 15 times the fee amount applicable to *each* dwelling unit--$15,240. In other words, contrary to Sheetz's contention, the required fee to build a single-family home was not significantly higher than the required fee for multifamily residential development. And the difference between the fee imposed per dwelling unit of a multifamily residential project in Zone 6 ($15,240) and a single-family residential project in the same zone ($23,420) was based

51

on (among other things) traffic studies, which determined that an individual dwelling unit of a multifamily residential development generates fewer vehicle trips per day (6.26) than a single-family residential development (9.45 to 9.55). Thus, because it was determined that single-family residential development generates more vehicle trips than one dwelling unit of a multifamily development (e.g., apartment complex), the County imposed a higher fee on that type of development.

Finally, we reject the remaining undeveloped arguments Sheetz offers in support of his contention that the TIM fee "fails" the *Dolan* "proportionality test." The administrative record does not, as Sheetz suggests, "confirm" that the challenged fee does not survive scrutiny under the *Dolan* standard because it includes a portion of the costs to complete roadway projects "that predated the 2012 fee schedule by over a decade" and the cost of addressing roadway deficiencies "caused by other uses." Nor has Sheetz otherwise demonstrated that the TIM fee does not satisfy the *Dolan* standard.

## DISPOSITION

The judgment is affirmed. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)


                                                      /s/
                                              Duarte, J.


We concur:


      /s/
Earl, P. J.


      /s/
Boulware Eurie, J.


52